G. Xavier **MONTEMAYOR** and Franklin T. Graham, Jr., Appellants,

v.

Becky **ORTIZ**, d/b/a Schors, Appellee.

G. Xavier Montemayor and Franklin T. Graham, Jr., Appellants,

v.

Jose Antonio Ortiz Fernandez, Jose Antonio Ortiz Celada, and Wife, Becky Ortiz, Appellees.

Nos. 13–04–224–CV, 13–04–358–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

July 20, 2006.

Supplemental Opinion Denying Rehearing Nov. 16, 2006.

Gilberto Hinojosa, Magallanes, Hinojosa & Mancias, Brownsville, William Kimball, Harlingen, for appellants.

Shelby Jordan, J. Norman Thomas, Jordan, Hyden, Womble & Culbreth, P.C., Corpus Christi, for appellees.

Before Justices HINOJOSA, YAÑEZ, and CASTILLO.

## OPINION

Opinion by Justice CASTILLO.

These two appeals were consolidated for the purposes of briefing and argument, and will now be addressed in a single opinion. Cause number 13–04–358–CV began as a declaratory judgment action filed on May 15, 2002, by appellants, G. Xavier Montemayor and Franklin T. Graham, Jr. (collectively "Montemayor"), against appellees Jose Antonio Ortiz Fernandez ("Fernandez"), his son Jose Antonio Ortiz Celada ("Celada") and Celada's wife, Becky Ortiz ("Ortiz"). Montemayor desired to collect on a monetary judgment against Fernandez and Celada that issued in 1990, and sought a declaratory judgment that properties of Schor's, a d/b/a of Ortiz, were community property of Celada and Ortiz and therefore subject to levy and execution for payment of the judgment debt.

In conjunction with the petition for declaratory judgment, and without notice to Ortiz, Montemayor sought and obtained a temporary restraining order and an ex parte receivership. Ortiz filed counterclaims on January 10, 2003, alleging that the ex parte receivership was obtained wrongfully, based on misrepresentations to the court, and had damaged her and her business. Causes of action included abuse of process, malicious prosecution, defamation, and intentional infliction of emotional distress.

Two partial summary judgments were entered in favor of Ortiz in 2003 in the declaratory judgment action reflecting: (1) the 1990 judgment was for collection of a debt, not a tort; and (2) Schor's was the "special community property" of Ortiz, at all times subject to her sole management and control, and not subject to levy or execution by Montemayor. Subsequent to entry of the two summary judgment orders, the counterclaims of Ortiz were severed (now cause number 13–04–224–CV on appeal). The severed action dealing with the damage claims proceeded to trial in August 2003; final judgment consistent with the jury verdict in favor of Ortiz issued in February 2004. At that point, Ortiz returned to court in the declaratory judgment action and obtained an award for attorneys' fees. Final judgment in that case issued in favor of Ortiz on April 19, 2004.

Appeal is brought from the orders granting the summary judgments, and from the findings and judgment in the severed action, concluding that Montemayor engaged in tortious conduct and awarding damages. We affirm the trial court's rulings reflected in appeal number 13–04–358–CV. We reverse the trial court's judgment in appeal number 13–04–224–CV, based upon no evidence to support the findings, and render.

## I. Background

In the mid 1980's, Fernandez and Celada had done business with the Brownsville Money Exchange. In 1986, they sought the immediate exchange of $140,000 in pesos for American dollars to satisfy some other debts. They received a check from the exchange; they then contacted it to advise that the check would not clear soon enough. They requested that $140,000 be forwarded by wire and they would return the check. The money was wired; the check was also deposited. After some dispute, but without litigation, Fernandez and Celada agreed to execute four promissory notes for the additional $140,000 in favor of the Brownsville Money Exchange. They

failed to pay on those notes; litigation ensued, and in June 1990, a judgment was entered against Fernandez and Celada for $203,013, with interest at the rate of eighteen percent per year until paid. That judgment was later assigned two-thirds to Montemayor (son of the owner of the exchange) and one-third to Graham (the attorney who handled the matter on behalf of the exchange and retained a contingency fee interest).

When still a newly-wed, Ortiz began Schor's in 1977 in partnership with her sister-in-law. The initial capital investment was $15,000; Ortiz contributed $7,500 given to her as a gift from her father. The sister-in-law was not interested in operating the business, which grew largely due to the efforts of Ortiz. Schor's expanded into two stores, operating as a jewelry store and interior decorating business. Ortiz bought out her sister-in-law in the early 1990s with monies earned from the business. During this time, Celada allegedly had nothing to do with the Schor's business; he focused on farming operations with his father in Mexico. Ortiz was aware that in the late 1980s, Celada and Fernandez started an unsuccessful steel business. She testified she was aware of financial difficulties, but not immediately aware of the promissory notes executed on behalf of the Brownsville Money Exchange. In 1990, Fernandez filed for Chapter 7 protection in bankruptcy. The principal amount of the 1990 judgment debt against him for $140,000 was not discharged, based on a finding by the bankruptcy court that the debt had been incurred through fraud.

Ortiz continued to reinvest profits from Schor's into the business, which grew to have an inventory value in excess of one million dollars by 2002. She contended at all times that Schor's was subject to her sole management and control, as either her separate or special community property, and that she and Celada separately managed their own business affairs. By 2002, Celada was not contributing to maintenance of the family, was absent much of the time, living in Mexico, and the couple initiated divorce proceedings.

In May 2002, Montemayor and Graham approached counsel about possibly collecting on the 1990 judgment against the Schor's property. Various unsuccessful attempts had been made to collect in the intervening years; frequently Celada could not be located for service.[1] Graham also testified that they did not earlier pursue the Schor's assets because the business was not initially big enough to fight about. By 2002, the 1990 judgment had grown, through accruing interest, to have a value in excess of $1,450,000.[2]

Montemayor filed a petition on May 15, 2002, requesting a temporary restraining order to "preserve the status quo," to prevent Fernandez, Celada or Ortiz from concealing or hiding assets of Schor's. They also sought and secured an ex parte appointment of a receiver, based upon affidavits which alleged imminent threat that the

---

1. The trial court was required to determine that the judgment was still valid and had not lapsed; it found that sufficient writs of execution were issued during the interim time to maintain its viability.

2. Graham testified that he formed a belief in 1994–1995 that Schor's was community property. He testified that in 1995, the amount of principal and interest owed on the judgment was approximately $464,000, but he had no information and made no inquiry as to the value of Schor's inventory at that time. He did not pursue Schor's at that time because he "didn't think there was enough value there to get into a fight about." Ortiz was not contacted because they did not want to give any warning that they were going to try to collect against the community property.

assets would otherwise disappear, and that Schor's was the community property of Celada and Ortiz and therefore subject to execution to satisfy the debt. The order appointing the receiver reflects that, in the petition, Montemayor contended that if emergency relief were not granted, the "assets and cash of said store [Schor's] will be concealed, transferred, removed, assigned, sold or hidden and that the Plaintiffs will be forever and irreparably injured...." The order appointed Rufus Ransome, Jr., ("Ransome") as "receiver of the inventory (including the jewelry, antiques, and merchandise), equipment, cash on hand, accounts receivable, and cash accounts or other depository accounts" of Schor's.

Ransome appeared at the store's facility on May 15, 2002, with order in hand. Store employees contacted Ortiz, who was shocked, but granted admittance and told employees to cooperate. Some other family member contacted Celada, who then appeared at the store, got into an altercation with Ransome, and told him to leave. Ransome left. Ortiz contacted an attorney, Dennis Sanchez, who immediately contacted counsel for Montemayor. An agreed order was negotiated and formally entered on May 28, 2002. It reflects that, based on representations that Fernandez and Celada would not be permitted access to Schor's and that no assets of Schor's will be transferred to them, Ortiz would be permitted to continue operating her business, buying and selling merchandise and conducting normal operations.[3] Under the agreement, the receiver would complete his inventory of all assets, and would have authority to review all purchases and sales, which he could stop at his own discretion.

At a hearing held June 7, 2002, the temporary restraining order was dissolved and replaced by a temporary injunction. The parties agreed the receivership would remain in place: "It is our agreement that Mr. Ransome will be able to continue to view the books and records, and look at the inventory, and examine the inventory on a weekly basis.... But if he believes something irregular is occurring such as looting of assets, or something like that, then he would have the right to come back and advise the Court and counsel." Ortiz was permitted to continue normal operations of her business. A formal order to this effect was entered June 24, 2002; however, this order was not "agreed" as some additional language was included.

In October 2002, Ortiz moved to dissolve the receivership; it was formally vacated on January 8, 2003. Ortiz also moved for two partial summary judgments. Partial summary judgment that the 1990 judgment was an action for debt, and not based in tort, was entered on February 21, 2003. Partial summary judgment that Schor's was at all times Ortiz's "special community property," subject to her sole management and control and not available for attachment to satisfy the 1990 judgment debt, was entered on May 27, 2003.

On August 11, 2003, the declaratory judgment action was severed from Ortiz's counterclaims for damages. Trial on the damage claims commenced on August 12, 2003. The jury verdict was entered August 22, 2003, awarding actual damages to Ortiz. The trial was bifurcated; punitive damages were awarded in an August 26, 2003, verdict. Final judgment was entered on the damage claims on February 5, 2004. Ortiz then returned to court in the

---

**3.** Provisions were also included for Ortiz to pay her staff and take a salary. The order also included language reflecting that it could not be used as evidence or referred to in argument except to enforce its terms, "including the Defendants' agreement to the appointment of the receiver."

declaratory judgment action, had a trial on attorneys' fees, and final judgment in that matter was entered in favor of Ortiz on April 19, 2004.

## II. The Declaratory Judgment Case—The Summary Judgments

Montemayor raises four issues on appeal relating to entry of the summary judgment orders. These orders arise in appeal number 13–04–358–CV. Issues one, two, and three involve the order concluding Schor's assets were the "special community property" of Ortiz, and not subject to any liability for the 1990 judgment. Montemayor contends the trial court erred because (1) they were jointly managed assets of Ortiz and Celada (issue one), (2) issues of material fact remained as to the nature of the property (issue two), and (3) issues of fact precluded summary judgment that the 1990 judgment was not the "joint debt" of Ortiz and Celada (issue three). In issue four, Montemayor contends that the trial court erred in finding that the 1990 judgment was based on contract and not in tort because material fact issues remained that required resolution by a jury.

### A. Summary Judgment—Standard of Review

■ The function of a summary judgment is to eliminate patently unmeritorious claims and defenses, not to deprive litigants of the right to a jury trial. *Alaniz v. Hoyt*, 105 S.W.3d 330, 344 (Tex.App.-Corpus Christi 2003, no pet.). The propriety of a summary judgment is a question of law. *See Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994). We therefore review de novo a trial court's order granting a traditional motion for summary judgment. *See id.* We review the evidence "in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences." *See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex.App.-Corpus Christi 2003, no pet.). The movant bears the burden of showing both no genuine issue of material fact and entitlement to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Hoyt*, 105 S.W.3d at 345. In deciding whether a genuine issue of material fact exists, we take evidence favorable to the non-movant as true. *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex.App.-Corpus Christi 2003, no pet.). We make all reasonable inferences and resolve all doubts in favor of the non-movant. *Id.* A non-movant has the burden to respond to a traditional summary judgment motion if the movant conclusively (1) establishes each element of its cause of action or defense, or (2) negates at least one element of the non-movant's cause of action or defense. *See id.*

We affirm a trial court's ruling on a summary judgment motion if any of the theories advanced in the motion is meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex.1993); *Boren v. Bullen*, 972 S.W.2d 863, 865 (Tex.App.-Corpus Christi 1998, no pet.).

### B. Summary Judgment that 1990 Debt is Based in Contract

■ Montemayor's fourth issue challenges the trial court's finding that the underlying 1990 judgment was for a debt in contract, rather than a judgment in tort. Preliminary resolution of this issue is crucial because, pursuant to section 3.202 of the Texas Family Code, unless both spouses are personally liable,[4] community prop-

---

4. Determination of whether or not Ortiz was personally liable is addressed below in con-

junction with Montemayor's issue three.

erty that is subject to one spouse's sole management, control, and disposition is not subject to nontortious liabilities that the other spouse may incur before or during marriage. TEX. FAM.CODE ANN. § 3.202 (Vernon 1998).

Ortiz moved for summary judgment, requesting the trial court to declare the 1990 judgment to have been based on a promissory note and not a judgment in tort. She asserted that any attempt to argue otherwise was barred by res judicata, collateral estoppel, and statute of limitations. The judgment itself reads:

> The court here finds that the defendants, JOSE ANTONIO ORTIZ FERNANDEZ and JOSE ANTONIO ORTIZ CELADA, executed Four (4) Promissory Notes, ... payable to the order of Plaintiff [Brownsville Money Exchange] ... The Court further finds that each of the Four (4) Notes provided for interest.... The Court further finds that the Plaintiff found it necessary to engage the services of an attorney to effect collection and that under the terms of said Notes the Defendants ... are liable for fifteen percent (15%) of the principal and interest due as an attorneys' fee, which the Court here finds to be reasonable, and which the Court here finds to total ... $26,479.95.

The judgment awarded $203,013.00 in principal (including accrued interest), interest forward until the date paid at the rate of eighteen percent (18%), and attorneys' fees.

Graham testified that the suit on the judgment did not involve Ortiz. He also testified that they did not urge tortious conduct in the underlying suit because it was not necessary. Montemayor nevertheless contends that the underlying judgment was based upon tortious, fraudulent conduct committed by Fernandez and Celada in 1986, and that this was confirmed by the bankruptcy court when it refused to discharge the debt against Fernandez. Montemayor urged the trial court to defer to the bankruptcy court's finding, and argued that fact issues remained as to whether Ortiz was a party to the fraud because she allegedly received $10,000 of the monies from the missing $140,000.

■ The 1990 judgment clearly sets forth that it was based on the failure to pay promissory notes. There is no mention of tortious or fraudulent conduct, despite the fact that tortious conduct was alleged to have taken place in 1986. Testimony of Graham confirms that no issues as to fraud were raised in securing the judgment on the notes. There is no dispute as to the contentions raised before the court in securing the 1990 judgment. The judgment clearly applies only to Fernandez and Celada. The judgment also awards attorneys' fees, consistent with the terms of the notes and with an action to collect on either a sworn account or an oral or written contract. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 (Vernon 1997). Attorneys' fees are not recoverable in an action in tort. *Knebel v. Capital Nat'l Bank,* 518 S.W.2d 795, 803–04 (Tex.1974) (citing *New Amsterdam Cas. Co. v. Tex. Indus., Inc.,* 414 S.W.2d 914, 915 (Tex. 1967)).

■ "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *John G. & Marie Stella Kenedy Mem. Found. v. Dewhurst,* 90 S.W.3d 268, 287 (Tex.2002) (citing *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). "[W]hen a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound 'not only as to every matter which was offered and re-

ceived to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" *Id.* Further, while neither res judicata nor collateral estoppel will bar an action for fraud where such an action could not have been asserted in the underlying proceedings, such is not the case here. All facts upon which allegations of fraud are based were well known at the time judgment was sought on the notes.[5] Additionally, nearly twelve years passed between the time of entry of the judgment (June 19, 1990), and Montemayor's filing of suit seeking to attach assets of Schor's. All time periods within which a judgment might be reformed, modified, or corrected, whether by motion to modify, a motion for new trial, or bill of review had expired long before May 2002. *See* Tex.R. Civ. P. 329b. Further, no such efforts to modify the judgment were ever undertaken. *See also Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990) ("The purpose of a statute of limitations is to establish a point of repose and to terminate stale claims.").

We conclude that the trial court properly determined in its order for partial summary judgment, which issued February 21, 2003, that the underlying 1990 judgment "was one for debt and Plaintiffs are barred from claiming it is for tort by res judicata, collateral estoppel and statute of limitations." We overrule Montemayor's fourth issue on appeal.

### C. Summary Judgment—Special Community Property

#### 1. The Judgment

Ortiz filed a separate motion for partial summary judgment in February 2003, re-

questing a declaration that Schor's was not community property and was not subject to attachment for the 1990 judgment debt. As exhibits, Ortiz included (a) affidavits explaining how Schor's had begun with the gift of $7,500 from her father, with the intent that it be her property; (b) deposition testimony of her accountant, Ygnacio Garza, who had handled tax filings for the partnership between Ortiz and her sister-in-law until it was dissolved, and who testified that Celada never signed checks, secured loans, or otherwise participated in the business of Schor's; (c) deposition testimony of Celada reflecting that he considered Schor's as Ortiz's separate property, always under her management and control, and that he had no participation in the business whatsoever; (d) copies of the assumed name certificates for Schor's, reflecting Ortiz as its owner; and (e) excerpts from Montemayor's deposition reflecting he had no personal knowledge of Celada's involvement in any of Schor's business affairs, other than hearsay that he occasionally assisted in hanging window blinds.

Montemayor countered with Ortiz's admission that profits from Schor's were reinvested into the business. He urges that, pursuant to *Cockerham v. Cockerham*, 527 S.W.2d 162 (Tex.1975), because community assets (the profits) were reinvested into Schor's, it lost its separate or special nature and became a community asset, subject to attachment for the judgment debt. Montemayor also urges that Ortiz and Celada filed joint tax returns, mutually taking advantage of depreciation or losses as well as profits from each other's businesses, and that Ortiz used funds of Schor's to maintain the household and family ex-

---

5. We note that objections to Fernandez's discharge in bankruptcy based upon alleged fraudulent conduct were necessarily filed prior to that court's findings that issued in No-

vember 1990. We further note that any findings of the bankruptcy court were limited to Fernandez, the debtor before it.

penses. Montemayor contends these actions establish that Schor's is community property.

The trial court concluded in its order of May 27, 2003, that all assets of Schor's during the marriage of Celada and Ortiz were the special community property of Ortiz, subject to her sole management, control and disposition, and were never subject to the liability of Celada reflected in the 1990 judgment. "The Schor's properties were not, and are not subject to levy and execution by [Montemayor] based upon the above judgment debt which this Court has already found to be, as a matter of law, a nontortious judgment debt based on promissory notes." We further note that, in concluding Schor's was the separate community property of Ortiz, and that those assets were not subject to levy and execution for Montemayor's judgment, the trial court necessarily concluded that Ortiz was not personally liable for the debt along with Celada. *See* TEX. FAM.CODE ANN. § 3.202 (Vernon 1998).

### 2. Analysis

■ We review the trial court's granting of the motion for summary judgment de novo, *Natividad,* 875 S.W.2d at 699, viewing the evidence "in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences." *KPMG Peat Marwick,* 988 S.W.2d at 748; *Branton,* 100 S.W.3d at 646.

In his first and second issues, Montemayor challenges the trial court's conclusion that Schor's was the special community property of Ortiz; in his third issue, he challenges the conclusion that the 1990 judgment was not a joint debt of Ortiz and Celada.

■ Texas recognizes both sole and joint-managed community property. TEX. FAM.CODE ANN. § 3.102 (Vernon 1998); *Douglas v. Delp,* 987 S.W.2d 879, 883 (Tex.

1999). Sole-management community property is that property which, though acquired during the marriage, would have belonged to that spouse if single. *Douglas,* 987 S.W.2d at 883. The trial court's decision also rests on application of family code section 3.202, which provides that marital property subject to the sole management, control and disposition of one spouse will not be subject to any nontortious liability of the other spouse. TEX. FAM.CODE ANN. § 3.202 (Vernon 1998). The court, as noted above, concluded the judgment in issue was a "nontortious" liability.

There is no dispute that the business of Schor's began subsequent to the marriage of Ortiz and Celada and grew during the term of their marriage. It began with a gift of monies from Ortiz's father to her, and operated as a separate partnership until the early 1990s. Evidence before the trial court demonstrated that Ortiz did control the business of Schor's, and that Celada had no input in its management or operations, and no direct access to checks or other financial aspects of the business. No evidence other than speculation was tendered to suggest otherwise.

However, our analysis does not end here. There is no dispute that profits from Schor's were reinvested into the business to assist in its growth. Additionally, it is undisputed that income from Schor's was used to fund family expenses. Montemayor contends that, pursuant to *Cockerham,* 527 S.W.2d 162, any independent management of the asset does not overcome the fact that the use of community assets (i.e., the profits of Schor's) transformed Schor's into a jointly managed community property of Ortiz and Celada. Montemayor further urges that the continued investment and reinvestment of business profits resulted in a commingling

making it impossible to trace the value of any separate property, and the statutory presumption of community property therefore prevails. *See Jones v. Jones*, 890 S.W.2d 471, 475 (Tex.App.-Corpus Christi 1994, writ denied).

Ortiz counters that *Cockerham* is distinguishable.[6] Section 3.102 of the family code provides that, during marriage, a spouse has the sole management, control and disposition of the community property that the spouse would have owned if single, including "(1) personal earnings; (2) revenue from separate property; (3) recoveries for personal injuries; and (4) *the increase and mutations of, and the revenue from, all property subject to the spouse's sole management, control and disposition.*" Tex. Fam.Code Ann. § 3.102 (Vernon 1998) (emphasis added).

*Cockerham* involved a circumstance where the wife had filed for divorce and then filed for chapter 7 bankruptcy because of her failed dress shop business. *Cockerham*, 527 S.W.2d at 164. The bankruptcy trustee intervened in the divorce to determine whether assets of the husband's dairy business could be attached to satisfy creditors of the dress shop. *Id.* It was undisputed that the dairy business had been operated independently of Mrs. Cockerham, *id.* at 168, and her dress shop had little or no participation from Mr. Cockerham, *id.* at 171. Analysis centered on whether the dairy business was accessible community property or whether it had remained under the sole management, disposition and control of Mr. Cockerham, with no commingling of its assets, such that it remained "special community property" that could not be reached by the

creditors. As with Schor's here, the dairy business was a sole proprietorship of the husband and debts of the dress shop had not been jointly incurred. *Id.* at 168–70. However, other facts diverge.

In *Cockerham*, the husband owned an undivided one-half interest in a 320–acre tract, along with his brother, prior to his marriage. *Id.* at 167–68. As such, his interest was his separate property. Cockerham and his wife later purchased his brother's one-half interest in the property through a convoluted transaction that ended up with a conveyance to both husband and wife. *Id.* at 168. The supreme court agreed that at all times, an undivided one-half interest in the property remained the separate property of Mr. Cockerham. *Id.* Testimony reflected no intent to gift the wife with an interest in the land. The one-half interest in the property was clearly traced and was adequate to rebut the presumption that all interest in the property became community at the time the other one-half interest was purchased. *Id.* The trustee therefore claimed a community interest in the remaining one-half interest, and in the dairy business.

The dairy business was located on the 320–acre tract. Mr. Cockerham urged that the dairy business had at all times been subject to his sole management and control, and relied upon the predecessor to section 3.102 of the family code,[7] much as Ortiz does here. *Id.* at 170. However, facts reflected that Mr. Cockerham and his wife effectively borrowed the cash necessary to purchase the community interest in the property, and title transferred into the name of each. The court considered this

---

6. *Cockerham v. Cockerham*, 527 S.W.2d 162, 169 (Tex.1975), involved application of the predecessor statute which reads essentially the same as the current section 3.202. *See* Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 1, sec. 5.61, 1969 Tex. Gen. Laws 2730.

7. Tex. Fam.Code Ann. § 3.102 (Vernon 1998). *See* Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 1, sec. 5.22, 1969 Tex. Gen. Laws 2727.

sufficient to establish that the community interest in the undivided one-half of the 320 acre tract was subject to the joint management of each. *Id.*

With respect to the dairy business, it was acquired during the marriage, and its proceeds were reinvested into the business. *Id.* at 170. Again, the distinction in how the land was acquired meant that proceeds of the dairy business were acquired not just by the labor of the husband by also by virtue of capital improvements that were community property. *Id.* Therefore, the dairy business was also under the joint management and control of each, and subject to attachment for debts of the dress shop, whether those obligations were of only the wife or joint obligations of each. *Id.* at 171.

We find *Cockerham* to be distinguishable from the matter before us. Here, unequivocal evidence reflected not only that Ortiz maintained full control over management and operations of Schor's, but also that no community capital assets were used to increase the business of Schor's. Schor's was initially purchased with Ortiz's separate property. Profits from Schor's were directly reinvested into Schor's, without prior commingling into community bank accounts. No debts were incurred or monies borrowed by both Ortiz and Celada to finance further growth of Schor's. Schor's did not grow by virtue of the infusion of other community funds. Schor's did not rely upon any community-owned real property. All investments into Schor's derived from "the increase and mutations of, and the revenue from, all property subject to the spouse's [Ortiz's] sole management, control, and disposi-

tion." TEX. FAM.CODE ANN. § 3.102(a)(4) (Vernon 1998).

In construing a statute, our objective is to determine and give effect to the Legislature's intent first by looking to the statute's plain and common meaning. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 652 (Tex. 2004). Because Schor's remained under the sole management and control of Ortiz, including any profits therefrom (whether or not some other portions of those profits were then contributed to the community), we conclude that the trial court properly determined that Schor's was the special community property of Ortiz, not subject to any nontortious liabilities of Celada, not a joint debt, and not subject to liability for the 1990 judgment debt. TEX. FAM.CODE ANN. §§ 3.102, 3.202 (Vernon 1998). We overrule Montemayor's first, second and third issues on appeal.

## III. The Damage Claims

Ortiz brought counterclaims against Montemayor for allegedly wrongfully pursuing the business assets of Schor's and for harassing her. After the trial court issued its two rulings on Ortiz's motions for partial summary judgment, those counterclaims in which Ortiz sought damages were severed from the declaratory judgment portion of the suit.

The claims for damages based on wrongful conduct proceeded to a bifurcated trial in August 2003. On August 22, 2003, the jury issued a verdict awarding actual damages to Ortiz in the amount of $335,000.[8] A supplemental verdict issued August 26, 2003, awarding punitive damages in the amount of $75,000.00 against Montemayor, individually, and $100,000 against Graham,

---

8. The jury awarded damages as follows: (a) $225,000 for past physical pain and mental anguish, (b) zero dollars for future physical pain and mental anguish, (c) $50,000 for past lost profits, (d) $10,000 for future lost profits, (e) $50,000 for past damage to reputation, and (f) zero for future damage to reputation.

individually. Final judgment incorporating these jury verdicts was entered on February 5, 2004. Findings relating to these claims are appealed under cause number 13–04–0224–CV.

## A. Issues on Appeal

In the consolidated appeal, Montemayor challenges the damages awards. In issues 5–11, he asserts the trial court erred as follows:

(a) issue 5—no evidence or legally insufficient evidence of abuse of process;

(b) issue 6—no evidence or insufficient evidence of defamation;

(c) issue 7—no evidence or insufficient evidence of intentional infliction of emotional distress;

(d) issue 8—no evidence or insufficient evidence of malicious prosecution;

(e) issue 9—no evidence or insufficient evidence of malice to support an award of punitive damages;

(f) issue 10—no evidence or insufficient evidence of mental anguish damages in tort;

(g) issue 11—no evidence or insufficient evidence of any causal connection between alleged lost profits and any act or omission of Montemayor;

(h) issue 12—no evidence or insufficient evidence to support award for damage to reputation.

■ The claims for damages all derive from a central contention that Montemayor acted wrongfully in securing the ex parte receivership. We note that a trial court is statutorily authorized to appoint a receiver in certain cases, including an ac-

tion by a creditor to subject any property or fund to its claim, on the application of the plaintiff or any party whose right to or interest in the property or fund or in the proceeds therefor is probable, and where it is shown that the property or fund is in danger of being lost, removed or materially injured. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 64.001 (Vernon 2005); *B & W Cattle Co. v. First Nat'l Bank of Hereford,* 692 S.W.2d 946, 950 (Tex.App.-Amarillo 1985, no writ). A court may even appoint a receiver on its own motion and without application of a party where the facts justify the appointment to preserve and protect property in litigation. *Cross v. Cross,* 738 S.W.2d 86, 87 (Tex.App.-Corpus Christi 1987, writ dism'd w.o.j.).

■ The parties do not dispute that issuance of an ex parte receivership is a harsh remedy to be exercised only in extraordinary circumstances. *See Indep. Amer. Sav. Ass'n v. Preston,* 753 S.W.2d 749, 750 (Tex.App.-Dallas 1988, no writ); *Tex. Consol. Oils v. Hartwell,* 240 S.W.2d 324, 327 (Tex.Civ.App.-Dallas 1951, no writ); *Parness v. Parness,* 560 S.W.2d 181, 182 (Tex.Civ.App.-Dallas 1977, no writ) (each involving interlocutory appeals from the order appointing a receiver).[9] However, even if a receivership were obtained wrongfully, as is urged in this matter, whether or not a party may recover on affirmative causes of action depends upon the elements of those causes of action.

Ortiz has never contended that the trial court erred or abused its discretion in ordering the receivership, based upon the information before it. No interlocutory

---

9. "The appointment of a receiver without notice to the adverse party is one of the most drastic remedies known," and should be exercised only in extreme cases where the rights are clearly shown in a verified bill or affidavit and based upon facts and circumstances rather than opinions and conclusions. Allega-

tions must be verified positively and not upon information and belief. *Wilkenfeld v. State,* 189 S.W.2d 80, 82 (Tex.Civ.App.-Galveston 1945, no writ). Immediate remedy is available by interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(1) (Vernon Supp.2005).

appeal was taken from the order granting the receivership, and no related issue is raised in this appeal. In fact, Ortiz entered into two agreements to extend the receivership in exchange for being able to operate her business. Ortiz contends she specifically reserved her right to later challenge the receivership. Although there were arguments before the trial court as to whether any such challenge was waived, we have no such issue before us on appeal. Instead, we address the issues raised, as they deal with the evidence tendered to support the counterclaims raised by Ortiz.

### B. Standard of Review

Montemayor claims there is no evidence to support any of the jury's findings. He challenges the legal sufficiency of the evidence with respect to the claim for abuse of process. With respect to all counterclaims except abuse of process, Montemayor contends in the alternative that evidence is "insufficient" to sustain the jury's findings, without specifying whether he challenges the legal or the factual sufficiency of the evidence.

 Inasmuch as Montemayor's prayer requests first that we reverse and render and, in the alternative, that we reverse and remand, we construe the issues to challenge the legal and factual sufficiency of the evidence for findings related to defamation, intentional infliction of emotional distress, malicious prosecution, punitive damages, and mental anguish. When both legal and factual sufficiency challenges are raised on appeal, the court must first examine the legal sufficiency of the evidence. *See Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981) (per curiam).

### 1 No Evidence—Legal Sufficiency

 We address legal-sufficiency challenges as either "no-evidence" or "matter-of-law" issues. *Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 183–84 (Tex.App.-Fort Worth 1995, no writ). We analyze the issue as a "no-evidence" challenge when, as here, the party complaining on appeal did not bear the burden of proof at trial. *Id.*

In challenging the legal sufficiency of the evidence to support a finding on which an adverse party, here Ortiz, bore the burden of proof, the appellant must show the record presents no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983).

> "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not."

*City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). We will review the evidence "in the light most favorable to the verdict, disregarding all contrary evidence that a reasonable jury could have disbelieved." *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex.2005) (per curiam). If the evidence presented at trial would permit reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Keller*, 168 S.W.3d at 822. The trier-of-fact, whether the trial court or the jury, remains the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Id.* at 819. It may choose to believe one witness and disbelieve another, and a reviewing court cannot impose its own opinions to the contrary. *Id.* "A reviewing court cannot substitute

its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.* at 822. "[T]he court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.*

We overrule a legal-sufficiency issue if the record reflects any evidence of probative force to support the finding. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). We sustain a legal-sufficiency challenge when (1) the record establishes the complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003) (per curiam); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Hines v. Comm'n for Lawyer Discipline,* 28 S.W.3d 697, 701 (Tex.App.-Corpus Christi 2000, no pet.). If there is more than a scintilla of evidence to support the finding, the legal-sufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998).

The evidence is no more than a scintilla and, in legal effect, is no evidence "[w]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence." *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). Suspicion linked to other suspicion produces only more suspicion, not some evidence. *Pitzner,* 106 S.W.3d at 727–28; *Browning–Ferris, Inc. v. Reyna,*

865 S.W.2d 925, 928 (Tex.1993). Similarly, an inference stacked only on other inferences is not legally sufficient evidence. *Pitzner,* 106 S.W.3d at 728. Conversely, more than a scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). We reverse and render judgment when we sustain a legal-sufficiency point. *Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 177 (Tex.1986) (per curiam); *Heritage Res., Inc. v. Hill,* 104 S.W.3d 612, 619 (Tex.App.-El Paso 2003, no pet.).

### 2. Factual Sufficiency

When reviewing a jury verdict to determine the factual sufficiency of the evidence, the party attacking a finding on which an adverse party bore the burden of proof must show that the record presents "insufficient evidence" to support the finding. *Gooch,* 902 S.W.2d at 184. We examine and consider all the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). If we reverse a trial court's judgment on factual-sufficiency grounds, we detail all of the evidence relevant to the issue and articulate why the finding is factually insufficient. *Maritime Overseas Corp.,* 971 S.W.2d at 407. We reverse and remand for a new trial when we sustain a factual-sufficiency point. *Glover,* 619 S.W.2d at 401.

### C. Analysis—The Counterclaims

### 1. Abuse of Process

Montemayor sought and obtained a temporary restraining order from the trial court to enjoin Ortiz, Celada, and Fernandez from hiding or secreting assets of Schor's, pending further ruling by the trial court on the nature of that property. Montemayor also sought and obtained an order from the trial court ordering the

appointment of a receiver for the principal purpose of doing an inventory of Schor's assets and accounts.

Ortiz contends that it was the process used in *securing* the ex parte appointment of the receiver that was wrongful. Montemayor proceeded ex parte and is alleged to have submitted false oaths and fatally defective pleadings reflecting that dissipation of the assets of Schor's was threatened if quick action were not taken, despite the fact that Montemayor knew of nothing to suggest risk of immediate dissipation or flight by Ortiz.[10] Ortiz contends that the alleged misrepresentations in the affidavits constituted a wrongful use of the court system and an abuse of process.[11] As noted, no interlocutory appeal was ever taken and the motion to vacate the receivership was not filed until October 18, 2002. Ortiz raises no allegations that the receiver acted outside the parameters of the court order or made false or wrongful comments to customers. The jury found that by obtaining the ex parte receivership and/or the ex parte temporary restraining order, Montemayor engaged in abuse of process which proximately caused damages to Ortiz.

■ Elements of a claim for the tort of abuse of process include (1) an illegal, improper, or perverted use of the process, neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damage as a result of the illegal act. *Graham v. Mary Kay, Inc.*, 25 S.W.3d 749, 756 (Tex.App.-Houston [14th Dist.] 2000, pet denied).

Montemayor, in issue 5, charges that none of these elements were established by Ortiz at trial.

■ Abuse of process is the malicious misuse or misapplication of process in order to accomplish an ulterior purpose. *Baubles & Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377, 378 (Tex.App.-Texarkana 1989, no writ) (citing RESTATEMENT (SECOND) OF TORTS § 682 (1977); W. KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 6 (5th ed.1984)). However, the critical aspect of this tort remains the improper use of the process after it has been issued. *Graham*, 25 S.W.3d at 756. Abuse of process exists where the original process is used to accomplish an end other than that which the writ was designed to accomplish. *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.-Houston [14th Dist.] 1994, writ denied); *see also Baubles & Beads*, 766 S.W.2d at 378; *Martin v. Trevino*, 578 S.W.2d 763, 769 (Tex.Civ.App.-Corpus Christi 1978, writ ref'd n.r.e.). Therefore, although the tort of abuse of process requires a showing that Montemayor lacked probable cause to institute proceedings, the ulterior motive required by that second element does not supplant, supersede, or substitute for the illegal or improper use of process required by the first element. *McCall v. Tana Oil and Gas Corp.*, 82 S.W.3d 337, 348–49 (Tex.App.-Austin 2001), *rev'd in part on other grounds*, 104 S.W.3d 80 (Tex.2003). Both elements must be established along with the third. *Id.* (citing *RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 134 (Tex. App.-Houston [14th Dist.] 1997, pet. de-

---

**10.** Ortiz also contends the affidavits were defective inasmuch as they were based upon speculation and "information and belief," rather than fact.

**11.** Montemayor argued at all times that the threat of dissipation by the other two named defendants, Fernandez and Celada, was very real. Montemayor did not urge that Ortiz

was the type of person to conceal or hide assets, but instead that Celada could access Schor's since it was community property, thereby placing its assets at risk. Throughout all court proceedings, Montemayor maintained he had a justifiable belief that Schor's was indeed community property.

nied)); *Baubles & Beads,* 766 S.W.2d at 378–79; *Martin,* 578 S.W.2d at 769.

Where process is used for the purpose for which it is intended, even though accomplished by an ulterior motive, no abuse of process has occurred. *Baubles & Beads,* 766 S.W.2d at 379.[12] "If wrongful intent or malice caused the process to be issued initially, the claim is instead one for malicious prosecution." *Bossin,* 894 S.W.2d at 33.[13]

We conclude there is no evidence of abuse of process and sustain Montemayor's fifth issue on appeal.

### 2. Malicious Prosecution

In his eighth issue, Montemayor alleges that no evidence or insufficient evidence existed to sustain a jury finding of malicious prosecution. Malicious prose-

cution is "generally available against one who maliciously caused process to issue and without probable or reasonable cause." *Martin,* 578 S.W.2d at 769. To prevail in a suit alleging malicious prosecution of a civil claim, the plaintiff must establish (1) the institution or continuation of civil proceedings against the plaintiff, (2) by or at the insistence of the defendant, (3) malice in the commencement of the proceeding, (4) lack of probable cause for the proceeding, (5) termination of the proceeding in plaintiff's favor, and (6) special damages. *Tex. Beef Cattle Co. v. Green,* 921 S.W.2d 203, 207 (Tex.1996). Among other things, Montemayor urges that Ortiz failed to establish that the allegedly wrongful action had terminated in her favor. Ortiz argues that the order setting aside the receivership is sufficient to satisfy this element.[14]

**12.** *See also J.C. Penney Co. v. Gilford,* 422 S.W.2d 25, 31 (Tex.Civ.App.-Houston [1st Dist.] 1967, writ ref'd n.r.e.) ("[A]n action for abuse of process cannot be maintained where the process was employed to perform no other function than that intended by law. The mere issuance of process is not actionable as an abuse of process.").

**13.** Case law addressing the wrongful issuance of an injunction (which was also claimed in this matter) is also illustrative. A person can bring two separate types of causes of action for wrongful injunction, one upon the bond ordinarily filed to obtain the injunction, and the other for malicious prosecution. The two actions differ in the kind of wrong which must be shown to establish liability and in the amount of recovery. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 686 (Tex.1990) (superseded by statute on other grounds).

A cause of action upon an injunction bond is predicated upon a breach of the condition of the bond. That condition, as prescribed by Rule 684, Texas Rules of Civil Procedure, is "that the applicant will abide the decision which may be made in the cause, and that he will pay all sums of money and costs that may be adjudged against him if the restraining order or temporary injunction shall be dissolved in whole or in part." To prevail upon this

cause of action, the claimant must prove that the temporary restraining order or temporary injunction was issued or perpetuated when it should not have been, and that it was later dissolved. The claimant need not prove that the temporary restraining order or temporary injunction was obtained maliciously or without probable cause. The purpose of the bond is to protect the defendant from the harm he may sustain as a result of temporary relief granted upon the reduced showing required of the injunction plaintiff, pending full consideration of all issues.... The only other cause of action for wrongful injunction is for malicious prosecution. " 'It is established by the weight of authority that in the absence of elements of an action for malicious prosecution no action will lie by the defendant in an injunction suit, independently of a bond or undertaking, for damages for the wrongful suing out of the injunction.' " To prevail upon this cause of action the claimant must prove that the injunction suit was prosecuted maliciously and without probable cause, and was terminated in his favor.

*Id.* at 685–86 (citations omitted).

**14.** On appeal, Ortiz argues that the receivership was set aside because it was obtained on false or improper allegations. The record does not reflect any such finding.

 A judgment can be considered final for purposes of issue and claim preclusion prior to the taking of an appeal. *Id.* However, this rule is not extended to the malicious prosecution context.

Far from relieving litigants and the judicial system of repetitive lawsuits with the possibility of inconsistent results, we believe that extension of the *Scurlock*[15] rule to malicious prosecution cases would actually promote repetitive and unnecessary litigation because it would allow the plaintiff to prosecute a claim only to have it rendered meaningless if later all or part of the appeal of the underlying action is decided adversely. *Id.* at 207–08. Accordingly, "an underlying civil suit has not terminated in favor of a malicious prosecution plaintiff until the appeals process for that underlying suit has been exhausted." *Id.*

Here, the first order for partial summary judgment (that the claim was for one of debt) issued on February 21, 2003; the second order for partial summary judgment (dealing with the nature of the Schor's property) issued on May 27, 2003. On August 11, 2003, an order was entered severing that portion of the case from Ortiz's claims for damages. The damage claims proceeded to trial in cause number 2002–08–4040–B. Subsequent to the jury verdict in that matter, the parties returned to court and Ortiz sought and obtained attorneys' fees in the declaratory judgment action under the original cause number, 2002–05–2004–B. Final judgment in the matter involving the damage claims issued February 5, 2004. No final judgment in the declaratory judgment action issued until April 19, 2004, following the trial on the issue of attorneys' fees. Clearly, the declaratory judgment portion of the suit had not terminated in Ortiz's favor prior to the jury verdict and judgment awarding her damages for malicious prosecution. Moreover, both matters are before this court on appeal simultaneously.

We conclude that the claim for malicious prosecution is premature, inasmuch as there is no evidence that the prosecution complained of, and on which the findings were based, had fully terminated in favor of Ortiz at the time the matter was presented to the jury.[16] We sustain Montemayor's eighth issue on appeal.

### 3. Defamation

 To recover for defamation, a private plaintiff must prove that the defendant (1) published a statement, (2) that was defamatory to the plaintiff, (3) while acting negligently as to the truth of the statement. *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998). A statement is defamatory if it tends to injure one's reputation, exposing one to public hatred, contempt, or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation. TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 2005). Libel is defamation expressed in written form. *Id.* Slander is a defamatory statement that is orally communicated or published to a third person without legal excuse. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex. 1995). Montemayor, in his sixth issue, complains that Ortiz tendered no evidence or insufficient evidence that he published any false or defamatory statements damaging her or her business, Schor's.[17]

---

**15.** *Scurlock Oil Co. v. Smithwick,* 724 S.W.2d 1, 6 (Tex.1986).

**16.** Further, the appeal on the matter does not conclude until the issuance of this opinion.

**17.** An action for injurious falsehood or business disparagement is similar in many respects to an action for defamation. Both involve the imposition of liability for injury sustained through publications to third par-

The jury charge inquired whether defendants [Montemayor] "published or caused to be published, through their acts, statements or conduct, a defamatory Ex Parte Temporary restraining order and defamatory Ex Parte Receivership over Becky Ortiz, by engaging in conduct that was a proximate cause of injury to her."[18] Definitions were included for libel, a defamatory statement, publication, negligently, and intentionally.

Ortiz bore the burden to show that Montemayor published the defamatory remarks that damaged her. *WFAA–TV,* 978 S.W.2d at 571. Ortiz alleges that the appointment of the receiver itself was defamatory. Communications made in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made. *James v. Brown,* 637 S.W.2d 914, 916 (Tex.1982). This privilege extends to any statements made by the judges, jurors, counsel, parties, or witnesses, and attaches to all aspects of the proceedings, including statements made in open court, pre-trial hearings, depositions, affidavits, and any of the pleadings or other papers in the case. *Id.* at 916–17. The privilege extends to statements made in contempla-

tion of and preliminary to judicial proceedings. *Watson v. Kaminski,* 51 S.W.3d 825, 827 (Tex.App.-Houston [1st Dist.] 2001, no pet.). The Supreme Court has also determined that a defense of legal justification will not be nullified even by a finding of actual malice. *Tex. Beef Cattle,* 921 S.W.2d at 205. "Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right." *Id.* at 211. "Improper motives cannot transform lawful actions into actionable torts." *Id.* Consequently, actions taken or statements made in conjunction with pursuit of a temporary restraining order or appointment of a receiver will not support a claim for defamation as a matter of law. *See James,* 637 S.W.2d at 916.

Ortiz also alleges a second source of defamation, "general rumors." Montemayor urges that the alleged rumors were (1) "too vague" to meet the element of "falsity," and (2) could not be attributed to him. Ortiz testified:

A: We immediately got calls from people. I mean, customers calling in, if we

---

ties of a false statement affecting the plaintiff. "The two torts, however, protect different interests. The action for defamation is to protect the personal reputation of the injured party, whereas the action for injurious falsehood or business disparagement is to protect the economic interests of the injured party against pecuniary loss." *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). The elements of a claim for business disparagement are publication by the defendant of disparaging words, falsity, malice, lack of privilege, and special damages. *Prudential Ins. Co. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 82 (Tex.2000). Regarding damages, the common law required a plaintiff in a defamation action to prove special damages in only a limited number of situations, whereas pecuniary loss to the plaintiff must always be proved

to establish a cause of action for business disparagement. *Hurlbut,* 749 S.W.2d at 766. Here, no separate question was submitted on business disparagement.

18. Testimony reflected that Mr. Ransome was appointed receiver for the sole purpose of conducting an inventory of the assets of the business. That process took approximately seven to ten days, ended in June 2002, and he never returned to the store after that. He did remain in the position of receiver, with authority to overview transactions and halt anything that seemed outside of normal day-to-day operations until the receivership was dissolved in December 2002 (the formal order was signed January 8, 2003).

were having a sale—if Schor's was closing. "What will you do if Schor's is closing? Where will we buy?" You know—I mean, we had people that thought that the Montemayors were going to be owning the store. "Oh Becky the store will never be the same without you owning the store." It was constant. It was people coming, last week. To this day, people are still, "How's everything going?" . . .

Q: Let's talk about other things that you saw in the store in the time once Mr. Ransome had come in. Tell us about customers that you—that you've never seen before that came in after that. Tell us about that.

A: Well, I noticed—I guess that it was that week, . . . and I just noticed people that I had never seen before, come into the store, coming in just to kind of see. "We heard the rumors. Something big was happening at Schor's. Schor's is in trouble." And they would come in just out of curiosity. . . . We knew by the way they came in, and the way they were looking to see—okay—"What's this big thing that is happening at Schor's." I mean, it was just very obvious.

Ortiz also testified as follows:

Q: And isn't it true, Mrs. Ortiz, that you have testified before that neither Xavier Montemayor nor Tommy Graham ever said anything bad about your business?

A: I don't know if they have or not. I don't think that they would say anything. I can't imagine anything. I don't know.

Q: That you have knowledge of.

A: I have no knowledge that they said anything to me directly, no.

Q: And what you told this jury, you are not saying that they went out to the public and said something bad about

your business, or disparage[d] it, or put it down in any form?

A: No. Just indirectly with the receivership.

Q: And that is just because of the receivership, but they never said anything to anybody?

A: No. It's—it's the act of the receivership.

Q: Now, isn't it true, that you testified that what you did hear Mr. Montemayor say, was, that he didn't want to harm your business, he didn't want to take your store, and he didn't want anything to do with that. You did hear that?

A: Yes, I did.

Q: That's what he said?

A: Uh-huh.

Q: Is that accurate?

A: That's accurate, that's what I heard he said.

Q: Do you recall testifying that Mr. Ransome—that you did not know whether Mr. Ransome had ever said anything false that damaged your business—that damaged you, or your business?

A: No. I mean, I know that he told people about what was going on at the store.

Q: But do you recall testifying, that as far as you knew, you did not know of anything false that he said that damaged you, or your business?

A: No.

Q: Is that accurate?

A: That's accurate.

Q: And isn't it likewise for Mr. Graham that you did not know of anything that he said false, that damaged your business?

A: I don't.

Q: Is that correct?

A: No. Except for the receivership. That's it.

Nothing in this testimony confirms that Montemayor was the source of any of the alleged rumors; nothing identifies any defamatory statements that could be attributed to either Montemayor, Graham, or the receiver. The fact that a receiver was in the store taking an inventory was not a rumor, but truth, and therefore communication of that fact could not have constituted defamation.[19] Further, we have concluded that the claims for abuse of process and malicious prosecution cannot stand; therefore they will not support a claim for defamation.

While we agree that a conditional or qualified privilege can be defeated with a finding of actual malice at the time of publication, *see Randall's Food Mkts.*, 891 S.W.2d at 646, the privilege in the context of judicial proceedings is absolute.

> Any communication, oral or written, uttered or published in the due course of a judicial proceeding is absolutely privileged and cannot constitute the basis of a civil action in damages for slander or libel. The falsity of the statement or the malice of the utterer is immaterial, and the rule of nonliability prevails even though the statement was not relevant, pertinent and material to the issues involved in the case.

*Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 166 S.W.2d 909, 912 (1942). The privilege extends to pre-trial proceedings, including affidavits filed with the court. *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994). A witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding. *Id.* "[A]n absolute privilege confers immunity regardless of motive whereas a conditional privilege may be lost if the actions of the defendant are motivated by malice." *Hurlbut*, 749 S.W.2d at 768.

Here, all alleged defamatory conduct arises solely in the context of judicial proceedings, or in conjunction with the appointment or presence of the receiver. There are no allegations that the receiver made statements to the public, outside of announcing his court-appointed role, which would obviate the privilege. Further, in any event, there must still be a defamatory statement that was published and that is directly attributable to the defendants. There is no evidence attributing such a statement to any of the appellants, or to the receiver. Allegations of rumors generated by the presence of the receiver, that cannot be attributed to a wrongful or defamatory statement by appellants, will not suffice.

We conclude the evidence for the claim of defamation is legally insufficient, and sustain Montemayor's sixth issue on appeal.

### 4. Intentional Infliction of Emotional Distress

In his seventh issue, Montemayor challenges the award of damages for intentional infliction of emotional distress, contending that Ortiz tendered either no evidence or insufficient evidence of either "extreme and outrageous" conduct or "severe emotional distress."

---

19. Truth is a complete defense to defamation. *Randall's Food Mkts. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995). Proving falsity in a defamation case is the plaintiff's burden of proof; in such a case, the defendant does not have the burden of proving substantial truth as an affirmative defense. *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 n. 1 (Tex.2005) (per curiam) (citing *Bentley v. Bunton*, 94 S.W.3d 561, 586–87 (Tex.2002)).

■■■■ To recover damages for this type of tort, a plaintiff must establish that (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe. *Hoffmann–LaRoche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex.2004) (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex.1998)). This tort is, first and foremost, a "gap-filler" tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex.2005) (citing *Zeltwanger*, 144 S.W.3d at 447). The tort's "clear purpose" is "to supplement existing forms of recovery by providing a cause of action for egregious conduct" that might otherwise go unremedied. *Id.* However, this "gap-filler" tort "should not be extended to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines." *Zeltwanger*, 144 S.W.3d at 447.

■■■■ Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Zeltwanger*, 144 S.W.3d at 445 (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993); RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Id.* (citing *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612 (Tex.1999); RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)).[20] Emotional distress includes all highly unpleasant mental reactions such as embarrassment, fright, horror, grief, shame, humiliation, and worry. *GTE Southwest, Inc.*, 998 S.W.2d at 618 (citing *Washington v. Knight*, 887 S.W.2d 211, 216 (Tex.App.-Texarkana 1994, writ denied); *Havens v. Tomball Cmty. Hosp.*, 793 S.W.2d 690, 692 (Tex.App.-Houston [1st Dist.] 1990, writ denied)). Severe emotional distress is distress that is so severe that no reasonable person could be expected to endure it. *Id.*

Montemayor alleges that no extreme or outrageous conduct occurred; instead, he sought only the appointment of a receiver to inventory Schor's assets and accounts based upon the legal presumption that all properties held by married persons are "jointly managed community properties." Montemayor relied upon the advice of counsel and acted with approval of a state district judge in obtaining the relief. He urges that the filing of suit and the use of legal process issued by the court do not support a claim for intentional infliction of emotional distress.

Ortiz confirmed she had testified that neither Graham nor Montemayor exhibited any ill will or malice toward her, but that she later "corrected" that testimony. She believed they engaged in illegal or unlawful activity specifically to harm her and to force her family to pay Celada's debt. She agreed Montemayor told her he didn't want to harm her, but felt she was being used as a "punching bag" for her husband and father-in-law. She testified this wasn't her debt, and she never borrowed

20. The jury charge inquired whether Montemayor intentionally inflicted severe emotional distress, and included definitions of "extreme and outrageous conduct," and intentional or reckless conduct. It also included an instruction that the tort only occurs when the emotional distress suffered was severe, but it did not define "severe" distress.

from Montemayor. Ortiz confirms in her testimony that it was the act of securing the receivership that caused her the distress and humiliation.

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.

*Brewerton v. Dalrymple,* 997 S.W.2d 212, 215 (Tex.1999) (citing *Twyman,* 855 S.W.2d at 621–22). "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.; see also GTE Southwest, Inc.,* 998 S.W.2d at 616 (holding that "it is not enough that the defendant has acted with an intent that is tortious, malicious, or even criminal, or that he has intended to inflict emotional distress;" the conduct itself must be extreme and outrageous).

The RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965) provides some illustrations of the type of conduct that might be considered sufficiently extreme and outrageous. These include (a) a practical joke suggesting another's spouse has been severely injured in an accident; (b) accusations made in front of others that an employee has violated territorial restrictions, followed by a public demand to tender all proceeds therefrom or risk being beaten up, having his truck destroyed, and being put out of business; and (c) giving a woman a bathing suit known to dissolve in water, causing her extreme embarrassment when she goes swimming in the presence of new male and female acquaintances.[21] *See id.* Additional examples of extreme and outrageous conduct arise where an actor is in a position of actual or apparent authority over the other: (a) a private detective presenting himself as a police officer and threatening arrest on charges of espionage unless certain letters are surrendered; (b) a school principal accusing a student of immoral conduct, bullying her for an hour, and then threatening prison and public disgrace; and (c) a creditor trying to collect a debt by forwarding letters reviling debtor as a deadbeat, dishonest, a criminal, and threatening lightening strikes, suits (that are never filed), garnishment of wages, disruption at his job until he is discharged, as well as physical threats. *See id.,* cmt. e. An example of conduct that does not rise to the level of extreme and outrageous is a creditor seeking to collect on a debt, calling debtors names, speaking in a rude and insolent manner, and indicating loss of trust. *Id.,* cmt. f.

 Here, we are faced with a situation in which a person was sent into a business to inventory goods, with the authority to monitor sales and purchases, but who was never rude, insolent or interfering (other than by his mere presence and authority). Moreover, the presence of this individual was court-sanctioned, and he never exceeded the parameters of his appointment. We are unable to conclude that the pursuit of a remedy through legal process, however invasive, or even injurious, constitutes outrageous conduct beyond the bounds of decency, such as that

---

21. Other examples of conduct that qualifies as extreme and outrageous, as to be atrocious and utterly intolerable in a civilized society, address circumstances where an actor has knowledge of another's peculiar susceptibility by reason of some physical or mental condition and takes advantage of that knowledge to cause the distress. RESTATEMENT (SECOND) OF TORTS § 46 cmt. f (1965).

which must be established to recover for intentional infliction of emotional distress. A party "must have latitude to exercise these rights in a permissible way, even though emotional distress results." *City of Midland v. O'Bryant,* 18 S.W.3d 209, 217 (Tex.2000) (citing *GTE Southwest, Inc.,* 998 S.W.2d at 612); *see also Gaspard v. Beadle,* 36 S.W.3d 229, 237–38 (Tex. App.-Houston [1st Dist.] 2001, pet. denied).

 The Supreme Court found no evidence of extreme and outrageous conduct where university administrators and employees made negative comments in a professor's tenure file, denied the professor tenure, restricted his speech about his tenure file, and assigned him an allegedly excessive course load. *Brewerton,* 997 S.W.2d at 216. Wrongful termination alone does not constitute extreme and outrageous conduct. *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998). Ordering an employee to immediately leave the premises, with a security guard escort, does not rise to the level of extreme and outrageous conduct. *Wornick Co. v. Casas,* 856 S.W.2d 732, 735 (Tex.1993). A company investigation, even assuming it used unethical methods, including false implications that the police believed there may have been criminal activity and contacts with other competing companies, the resulting termination of the employee, and his inability to find another job, constituted no evidence of extreme and outrageous conduct. *Tex. Farm Bureau Mut. Ins. Co. v. Sears,* 84 S.W.3d 604, 611 (Tex.2002).

> [A]lthough a defendant's motive or intent is relevant to an intentional infliction of emotional distress claim, it is not enough to support liability. Rather, "the conduct itself must be extreme and outrageous." Accordingly, any punitive intent or personal vendetta underlying Farm Bureau's post-termination acts

will not, standing alone, support an extreme and outrageous finding. Instead, we must examine Farm Bureau's conduct.

*Id.* (citations omitted). In *Sears,* evidence reflected that there was a reasonable belief that Sears was involved in some suspicious dealings; to find the resulting investigation was extreme or outrageous "would be tantamount to imposing liability for negligent infliction of emotional distress, a cause of action that Texas does not recognize." *Id.* The court concluded there was no evidence of extreme or outrageous conduct. *See also Creditwatch,* 157 S.W.3d at 817 n. 20 (citing *Sears,* 84 S.W.3d at 612 (concluding that even a personal vendetta can be insufficient to constitute intentional infliction of emotional distress if the act taken was not outrageous)).

We reach the same conclusion here. There was ample evidence before the court that Montemayor, whether or not incorrectly, held a bona fide belief that the property of Shor's was community property, and therefore accessible to him as a creditor. There is evidence that Celada had, in the past, taken steps to evade satisfaction of the outstanding debt. The complained-of conduct, alleged to have been extreme and outrageous, consisted of a remedy sought through the court system. The conduct was sanctioned by court order. There was no allegation of conduct outside the parameters of that prescribed by the court; instead argument was solely that the receivership was wrongfully secured.

 We note the supreme court did find extreme and outrageous conduct in *GTE Southwest, Inc.,* 998 S.W.2d at 617, where the supervisor regularly assaulted, intimidated, and threatened employees, creating a "den of terror" through a pattern of ongoing harassment and abuse. We find no evidence of such ex-

treme conduct in the record before us. We conclude there is no evidence of extreme and outrageous conduct, such that a claim for intentional infliction of emotional distress cannot be maintained. We sustain Montemayor's seventh issue on appeal.[22]

### 5. Malice and Punitive Damages

■ The jury determined that harm to Ortiz resulted from malice by both Graham and Montemayor. The charge included a definition of clear and convincing evidence, and a definition for malice.[23] In the supplemental charge, the jury assessed exemplary damages for that malicious conduct in the amount of $75,000 against Montemayor, and $100,000 against Graham.

■ We cannot ignore that the finding of malice and the awards for punitive damages were predicated upon findings of tortious conduct by Montemayor. The purpose of punitive damages is to "punish the defendant" and "for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future." *Moriel,* 879 S.W.2d at 27 (citing *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)).

The jury instruction properly provided that the jury should consider the nature of the wrong, the character of the conduct,

---

**22.** We pause to address the question of the severity of Ortiz's distress. The receivership happened at about the same time she was seeking a divorce from Celada. She testified that when she learned of the receivership, she was stunned, shocked, and could not talk. She was humiliated; many persons approached her at various events to express concern and support. She worried about her store closing and that her reputation, which had been impeccable, was harmed. She felt invaded, abused, and scared. She testified she could not sleep, cried at a moment's notice, got stomach and chest pains, and felt depressed. She did see her doctor (gynecologist), complaining of stress and marital discord, and he prescribed sleeping pills and some anti-depressants. On cross-examination, she conceded she never visited a psychiatrist, and was told by another doctor (to whom she also complained about stress due to getting a divorce) to exercise instead of taking anti-depressants.

As noted above, to prevail on this claim, a plaintiff must establish that emotional distress is severe. *GTE Southwest, Inc., v. Bruce,* 998 S.W.2d 605, 618 (Tex.1999). Feelings of anger, depression, and humiliation are insufficient evidence of severe distress. *Regan v. Lee,* 879 S.W.2d 133, 136–37 (Tex.App.-Houston [14th Dist.] 1994, no writ) (per curiam). Ortiz testified that her embarrassment hindered her business and her relations with customers during the presence of the receiver in her office; she testified she experienced sleeplessness, and some depression. However, she did not testify that her distress was unendurable. She testified she carried on because she had to be strong for her children. The record also reflects that during the time in which she is alleged to have sustained mental anguish damages, she worked to maintain her business by focusing more on in-home decorating services rather than on jewelry sales. There is no testimony that she was unable to perform well in these one-on-one relations with her clients and, indeed, her skill in personal relations appears to be one of the strengths of her business. During this period, business revenues remained relatively constant, despite alleged disruptions in the store, because she was able to perform these other services. We conclude that there is legally insufficient evidence that the distress she sustained constituted "severe distress" as it is currently defined.

**23.** The charge defined malice to mean "a specific intent" or "an act or omission" by either Montemayor or Graham which, "when viewed objectively from the standpoint of at [sic] the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which Montemayor or Graham had actual subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety or welfare of others."

the degree of culpability, the situation and sensibilities of the parties concerned, and the extent to which such conduct offends a public sense of justice and propriety.[24] All considerations, however, were predicated upon a finding of wrongdoing. Inasmuch as we have sustained Montemayor's issues on appeal relating to abuse of process, malicious prosecution, defamation, and intentional infliction of emotional distress, we conclude that there is no basis to award punitive damages. "Without evidence of actual damages, punitive damages cannot be recovered." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Accordingly, we sustain Montemayor's ninth issue on appeal.[25]

### 6. Mental Anguish

 Mental anguish damages may not be awarded without either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine," or other evidence of " 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.' " *Id.* at 614. These types of damage awards are designed to compensate non-economic losses. *Moore v. Lillebo*, 722 S.W.2d 683, 687 (Tex. 1986). However, being a measure of damages and not a finding of liability, mental anguish damages must also be predicated upon a finding of wrongdoing. "Mental anguish consists of the emotional response of the plaintiff caused by the tortfeasor's conduct." *Birchfield v. Texarkana Mem. Hosp.*, 747 S.W.2d 361, 368 (Tex.1987). Where there is no tortious conduct, such an award cannot stand. Accordingly, we sustain Montemayor's tenth issue on ap-

peal, without reaching whether or not the evidence was sufficient to support the jury's finding, had an underlying tort been established.

### 7. Sufficiency of Evidence— Lost Profits, Damage to Reputation

Because of our conclusions with respect to Montemayor's fifth, sixth, seventh, and eighth issues, we do not reach his eleventh issue, involving sufficiency of the evidence for any causal connection between alleged lost profits and an act or omission of Montemayor, or his twelfth issue, involving sufficiency of the evidence to support an award for damage to reputation. Tex. R.App. P. 47.1.

### IV. Conclusion

We affirm the trial court's rulings relating to the motions for summary judgment as reflected in appeal number 13–04–358–CV. We reverse the trial court's judgment in appeal number 13–04–224–CV, based upon either no evidence to support the findings, and render that Ortiz take nothing.

Concurring Opinion by Justice Linda Reyna Yañez.

YAÑEZ, Justice, concurring.

I write separately to note that the names of the Appellees may create some confusion. In light of the fact that this opinion is a legal document, I believe it is important to refer to the parties by their proper names. Appellee, Jose Antonio Ortiz Fernandez is referred to as "Fernandez"; his paternal last name is actually Ortiz. In Mexico, persons routinely use

---

**24.** The charge also permitted consideration of the net worth of Montemayor and Graham. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.011 (Vernon 1997).

**25.** We do not reach whether evidence was sufficient to sustain the awards for punitive damages, in the event the underlying foundational tort were found to exist.

their maternal last name following the paternal last name. In the U.S., it is customary to use a paternal last name as a person's last name. In Mexico, Appellee Jose Antonio Ortiz Fernandez would be referred to as "Sr. Ortiz Fernandez". In the U.S., he would be referred to as "Mr. Ortiz, Sr." The same applies to Appellee Jose Antonio Ortiz Celada: he is properly referred to as "Mr. Ortiz, Jr." as he is Mr. Ortiz, Sr.'s son. Similarly, Appellee Becky Ortiz is "Mrs. Ortiz" as she is Mr. Ortiz Jr.'s spouse. Consequently, we should refer to the Appellees as either "Ortiz–Fernandez" or "Ortiz, Sr."; "Ortiz–Celada" or "Ortiz, Jr.", but not as "Fernandez" and "Celada". Since the beginning of immigration to this country, the U.S. authorities would arbitrarily "change" the last names of immigrants because the maternal last name was the last name in the series of names from their native country. Consequently, immediate family members ended up with legal names that were inaccurate. I concur with the result and analysis in this case but I object to the use of the maternal last names of appellees as they are incorrectly used as if they are their paternal last names.

## OPINION ON REHEARING

Opinion by Justice CASTILLO.

Both appellants and appellee have filed motions for rehearing. We deny appellee's motion for rehearing. We similarly deny appellant's motion for rehearing. We provide this supplemental opinion on rehearing to fully address the question of attorney fees in the declaratory judgment action, appellate cause No. CV–04–358–CV. These issues do not alter the Court's opinion in this appeal which issued July 20, 2006.

### I. The Issues

Appellants' issues thirteen, fourteen and fifteen on appeal are framed as follows:

13. The trial court erred in granting judgment for attorney fees because Ortiz failed to timely designate Shelby Jordan as a fact and expert witness, and Ortiz also failed to timely produce documents admitted into evidence pursuant to appellants' request for production. All such evidence should have been excluded.

14. The trial court erred in granting judgment for attorney fees because Ortiz failed to properly segregate attorney fees incurred to obtain her declaratory judgment versus attorney fees incurred to prosecute tort damage claims and other matters.

15. The trial court erred in granting judgment for attorney fees because there was no right to recover attorney fees under the declaratory judgment act. Ortiz's declaratory judgment action raised no new factual or legal issues that were not already raised in appellants' pleadings.

### II. Background

As we noted in our opinion, partial summary judgment in the declaratory judgment action that the 1990 judgment was an action for debt, and not based in tort, was entered on February 21, 2003. Partial summary judgment that Schor's was at all times Ortiz's "special community property," subject to her sole management and control and not available for attachment to satisfy the 1990 judgment debt, was entered on May 27, 2003. On August 11, 2003, the declaratory judgment action was severed from Ortiz's counterclaims for damages. Following a jury trial on the damage claims, Ortiz returned to the trial court in the declaratory judgment action to pursue her claim for attorney fees.

On September 8, 2003, Ortiz filed a motion for determination of attorney fees and

for severance. Montemayor and Graham (collectively "Montemayor") objected. On November 4, 2003, the trial court issued a letter to counsel advising that it found the fee request to be excessive and unreasonable, and that $35,000 would be awarded in fees. Montemayor and Ortiz objected. Judgment awarding $35,000 in fees to Ortiz was entered on January 13, 2004. Ortiz subsequently filed a motion for new trial as to the attorney fees, complaining of the trial court's summary disposition of the issue. Montemayor also filed a motion for new trial. At a hearing held on February 27, 2004, both parties objected to the fee award and agreed the issue needed to be tried. A new trial was granted and set to commence March 22, 2004, less than thirty days later.[1]

The charge submitted to the jury included a request for a dollar amount of attorney fees reasonably and necessarily incurred by Ortiz in "this" lawsuit. The jury's response was $142,908.72 for representing Ortiz in court, $20,000 for representing her on appeal, and $15,000 for any appeal to the Supreme Court of Texas. Final judgment incorporating this award was entered April 19, 2004.

### A. Discovery Documents

Requests for Disclosure were propounded to Ortiz on May 29, 2002. Supplemental responses, provided in February and March 2003, include identification of various persons with knowledge of relevant facts, and various experts. Mr. Frank Perez is identified as the expert who would testify as to the reasonableness and necessity of attorney fees. Montemayor's Third Request for Production was propounded to Ortiz on October 14, 2003. The requests call for production of any and all attorney fee agreements, attorney fee billing statements, and payments for retained or other services made to attorneys. On November 14, 2003, Ortiz responded by objecting to each request.

Following the hearing on February 27, 2004, a jury trial was scheduled for March 22, 2004. On March 3, 2004, Montemayor file a motion to compel discovery and for sanctions, complaining of Ortiz's failure to respond to the third set of requests for production. On March 11, 2004, Ortiz produced documents responsive to the requests, including Ortiz's fee agreement and detailed time records of Shelby Jordan and Norman Thomas, counsel for Ortiz. Ortiz also notified Montemayor of her intent to use Jordan as an expert on attorney fees, and tendered him for deposition. Jordan's deposition was taken on approximately March 18, and Montemayor reviewed with him the related documentation and his prospective testimony.

### B. Trial

At the hearing on pre-trial motions held March 22, Montemayor objected to the admission of Jordan's testimony, contending he was either never designated, or was late designated as an expert. Ortiz contended that Jordan had been designated as soon as it was learned the motion for new trial had been granted, and further that, having taken Jordan's deposition, Montemayor would sustain no unfair surprise. The trial court overruled Montemayor's objections and permitted Jordan to testify. The trial court also overruled Montemayor's objections to the admission of attorney fee and billing records.

Jordan testified as to his experience and expertise, and his hourly rates. He testified that he did not bill Ortiz at his usual rate of $375, but instead at the reduced

---

1. Montemayor's motion for new trial also complained of the trial court's substantive findings in the declaratory judgment. Only the attorney fee issue proceeded to trial.

rate of $250 an hour. He testified that Montemayor first filed suit requesting declaratory judgment in May 2002. Jordan's involvement in the case began even before the fee agreement was signed.[2] He discussed the nature and complexity of the case, including each party's request for a declaratory judgment, and the volume of pleadings and other filings exchanged between the parties. Jordan stated he brought in additional local counsel and other counsel as well to share the work load but that, pursuant to the fee agreement, no additional fees would be due by Ortiz; rather, the attorneys would divide any recovery.

Jordan and his firm maintained time records of services rendered in the case. The contingency fee agreement called for Ortiz to pay costs of the litigation as they were incurred. Fees in Ortiz's exhibit 6 totaled $183,000, but some portions were redacted and not requested because they were unrelated to the declaratory judgment action. Fees requested totaled $131,268.50, plus $11,000 in costs for a total of $142,268.50.[3]

Jordan testified that fees and services associated with the other affirmative claims brought by Ortiz, which had been severed and were pursued separately to a jury trial, were not included in this fee request. He estimated what reasonable and necessary fees would be for any appeal. Jordan was fully cross-examined.

William Kimball, counsel for Montemayor, testified to counter the assertions of Jordan. He testified he was familiar with pleadings filed in the case and that he had reviewed Jordan's billing records. He complained of the vagueness of certain billing entries, and expressed his opinion that many of the services reflected in those records did not relate to issues in the declaratory judgment action. He contested specific entries. Kimball and counsel for Montemayor contended that Ortiz should only be able to recover fees, if at all, for work done on the sole issue of whether or not Schor's was her special community property. Kimball opined that in Jordan's firm billing records, only 5.2 hours properly dealt with that issue, and those were spent by an attorney billing at $180 per hour. He also opined that only 33 hours of Thomas's time could be attributed to this issue, at a rate of $200 per hour, bringing the total reasonable fees to only $7,500–$8,000. Kimball distinguished the different suits involved, the issues in each, and opined that the other suits had no bearing on the matters in the declaratory judgment action. Ortiz's cross-examination of Kimball explored Ortiz's contrary view. The fact of the severance was discussed.

The jury returned a unanimous verdict awarding to Ortiz $142,908.72 in fees, plus $20,000 for any appeal to the court of appeals, and $15,000 for any appeal to the Texas Supreme Court. Judgment on this verdict was entered on April 19, 2004. This appeal ensued.

### III. Standard of Review

 The Declaratory Judgments Act provides that in proceedings brought under it, "reasonable and necessary attorney's fees" may be awarded as are "equitable and just." TEX. CIV. PRAC. & REM.CODE

---

2. Jordan's firm first formally appeared as counsel of record in the case in February 2003. The time records reflect consultations and services rendered beginning in late August 2002. Jordan testified that he and Ortiz first reached an oral agreement regarding his representation; the later written fee agreement is dated November 1, 2002.

3. The exhibit also includes time records and fees incurred on behalf of Ortiz by counsel J. Norman Thomas who assisted in the matter.

ANN. § 37.009 (Vernon 1997); *Allstate Ins. Co. v. Hallman,* 159 S.W.3d 640, 643 (Tex. 2005). The reasonable and necessary requirements are questions of fact to be determined by the fact finder, but the equitable and just requirements are questions of law for the trial court to decide. *Ridge Oil Co. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 161 (Tex.2004). "Unreasonable fees cannot be awarded, even if the court believes them just, but the court may conclude that it is not equitable or just to award even reasonable and necessary fees." *Id.* at 161–62 (citing *Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex.1998)).

■■■ A judge's decision to award or not award attorney's fees is reviewed on appeal for an abuse of discretion. *Id.* at 163. To find an abuse of discretion, the trial court must have acted without reference to any guiding rules or principles, such that the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id.* at 242.

■■■ Similarly, the admission and exclusion of evidence is committed to the trial court's sound discretion. *Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.,* 176 S.W.3d 307, 315 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *Moore v. Bank Midwest, N.A.,* 39 S.W.3d 395, 401 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998) (citing *State Bar of Tex. v. Evans,* 774 S.W.2d 656, 658 n. 5 (Tex.1989)). We will not reverse a trial court for an erroneous evidentiary ruling unless the er-

ror probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1; *Malone,* 972 S.W.2d at 43; *see also Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989).

■■■ With respect to the conclusions of the jury, the trier-of-fact remains the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex.2005). It may choose to believe one witness and disbelieve another, and a reviewing court cannot impose its own opinions to the contrary. *Id.* "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.* at 822. "The court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.*

## IV. Analysis

### A. Admissibility of Testimony and Documents to Support the Fee Award

■■ Montemayor urges that the trial court erred in permitting Jordan to testify as a fact or expert witness because he was not timely designated. Montemayor further urges that because Ortiz failed to timely respond to production requests, all documentary evidence admitted in support of the attorney fees should have been excluded.

Texas Rule of Civil Procedure 193.6 provides that a party who fails to amend or supplement discovery in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness who was not timely identified, unless the

court finds (1) there was good cause for the failure to timely supplement, or (2) the failure will not unfairly surprise or unfairly prejudice the other parties. Tex.R. Civ. P. 193.6. The burden to establish good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness; any finding of good cause or lack of unfair surprise or unfair prejudice must be supported by the record. *Id.*

Ortiz contended there was no unfair surprise. The trial court repeatedly overruled Montemayor's objections to entry of the evidence and the testimony, at both the pre-trial hearing and at trial. Implicit in the trial court's decisions, both to permit Ortiz's witness to testify on attorney fees and to admit the related documentary evidence, is a determination that there was good cause or no unfair surprise in any late disclosure of the witness or the documentation. *Bellino v. Comm'n for Lawyer Discipline,* 124 S.W.3d 380, 384 (Tex.App.-Dallas 2003, pet. denied) (citing *Capital Metro. Transp. Author./Cent. of Tenn. Ry. and Navigation Co. v. Cent. of Tenn. Ry. and Navigation Co.,* 114 S.W.3d 573, 583 (Tex.App.-Austin 2003, pet. denied) (finding of unfair surprise implicit in court's ruling)); *see also De La Rosa v. St. John,* No. 03–99–0282–CV, 2000 WL 235173, at *3, 2000 Tex.App. LEXIS 1371, at *6 (Tex. App.-Austin March 2, 2000, no pet.) (designated as opinion) (finding an implicit ruling of good cause in the trial court's ruling in favor of admission of the evidence and testimony).

Additionally, the record is unequivocal that the sole issue to be addressed in the forthcoming trial was attorney fees. Subsequent to the disclosure of the information in issue, the deposition of Jordan was scheduled and taken by Montemayor. Testimony provided at trial by Kimball, counsel for Montemayor, reflected he had reviewed in detail the fee records as well as Jordan's deposition testimony. Cross-examination of Jordan was full and competent.

We conclude the record supports an implicit finding of lack of unfair surprise, and that the trial court did not abuse its discretion in permitting the witness to testify and the documentary evidence to be admitted. *Bellino,* 124 S.W.3d at 384; *Capital Metro.,* 114 S.W.3d at 583. Accordingly, we conclude the trial court did not err in admitting either the testimony or the documentary evidence of the fee records. We overrule Montemayor's issue thirteen on appeal.

## B. Segregation of Fees

Montemayor next urges it was error to submit evidence of all the various fees to the jury because Ortiz failed to properly segregate attorney fees related solely to pursuit of the declaratory judgment issues. Montemayor argues that, because of this failure, the jury award was excessive, unreasonable, and conflicted with the trial court's earlier finding.

The trial court issued its first judgment awarding fees without any hearing or evidence of the parties. Montemayor in fact objected to entry of that order on fees, and Ortiz had requested a jury trial on the issue. Both parties filed a motion for new trial on the issue of attorney fees; that new trial was granted, and the earlier judgment was withdrawn. The question was then presented to the jury as the fact finder.

The trial court has broad discretion in granting a new trial. *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988) (orig. proceeding) (per curiam). When a motion for new trial is granted, the original judgment is set aside and the parties may proceed

without prejudice from previous proceedings. *Markowitz v. Markowitz,* 118 S.W.3d 82, 88 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (citing *In re Marriage of Wilburn,* 18 S.W.3d 837, 844 (Tex. App.-Tyler 2000, pet. denied); *Long John Silver's Inc. v. Martinez,* 850 S.W.2d 773, 777 (Tex.App.-San Antonio 1993, writ dism'd w.o.j.)). Granting a new trial has the legal effect of vacating the original judgment and returning the case to the trial docket as though there had been no previous trial or hearing. *Id.* (citing *Pinkley v. Vega,* 768 S.W.2d 473, 475 (Tex.App.-El Paso 1989, no writ) (finding that order granting new trial vacates former judgment in its entirety); *Schintz v. Morris,* 13 Tex.Civ.App. 580, 35 S.W. 516, 519 (Tex. Civ.App.-Austin 1896, orig. proceeding) (noting that a decision to grant a motion for new trial, thereby setting aside the only judgment that was rendered on the verdict, had "the effect of destroying the life of the verdict for all purposes.")). Any argument by Montemayor that the earlier judgment should prevail over the subsequent verdict and judgment based thereon is without merit.

■ With respect to segregation of fees, Montemayor argues that Ortiz recovered for time spent not just on the declaratory judgment action dealing with whether or not Schor's was her separate property, but also other claims, including other declaratory judgment claims and counterclaims based in tort. A plaintiff is required to show that the fees were incurred in conjunction with the prosecution or defense (in the context of a declaratory judgment) of a claim which allows recovery of such fees. Recovery of attorney fees is statutorily permissible under the Texas Declaratory Judgments Act; fees may be awarded "as are equitable and just," without the requirement that a party prevail on its claims. TEX. CIV. PRAC & REM.CODE ANN. § 37.009 (Vernon 1997).

Here, Montemayor originally brought suit seeking a declaratory judgment of the right of the Plaintiffs [Montemayor] to execute and foreclose upon the personal properties ... and/or equipment of the Defendants and/or Schor's jewelry stores ..." and that "said personal properties ... inventory and/or equipment of the Schor's jewelry stores is the community property of defendants Celada and Becky Ortiz; that said cash and properties are subject to levy and execution by the plaintiffs based upon said judgment debt. . . .

Subsequently, Ortiz filed counter-claims seeking a declaratory judgment that Ortiz was not personally liable on the judgment, and that neither Ortiz nor her business assets of Schor's were subject to the judgment debt underlying Montemayor's action to levy on that property. Ortiz also sought a declaration that the judgment on the debt was dormant. Ortiz's counterclaims included several based in tort; those were later severed from the declaratory judgment actions.

Evidence at trial included testimony that work on the declaratory judgment issues was consuming and closely intertwined with all other issues, up until the date of the severance. Jordan further testified that time incurred prior to the severance that was attributable to the tort claims had been redacted from the fees requested; time attributed to trial preparation and trial on the tort claims similarly had not been included in the fee request. Full cross-examination of Jordan occurred; an attorney also testified on behalf of Montemayor. The jury had the opportunity to not only evaluate the testimony but also to review the fee statements.

■ As noted above, the jury, as trier-of-fact, is the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller,* 168 S.W.3d at 819. It may choose to believe

one witness and disbelieve another; a reviewing court cannot impose its own opinions to the contrary or substitute its judgment for the trier of fact, so long as the evidence falls within the zone of reasonable disagreement. *Id.* Further, "segregation of fees is not required if services are rendered in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts." *Hill v. Heritage Res., Inc.,* 964 S.W.2d 89, 143 (Tex.App.-El Paso 1997, pet. denied). The jury could reasonably have concluded either that the fees had been appropriately segregated, or that remaining fees, if not fully segregated, related to services that were so intertwined as to make further segregation impractical and unnecessary.

■■ Montemayor contends the fee award is unjust as a matter of law. Whether the fees are reasonable and necessary is a question of fact for the jury. *Bocquet,* 972 S.W.2d at 21. Whether the fees are also equitable and just is an equitable consideration, submitted to the trial court's discretion, and it is an abuse of discretion to rule arbitrarily, unreasonably, or without regard to guiding legal principles. *Id.* Jordan testified that he had reduced his normal fee, his firm had expended numerous hours and extensive efforts in litigating her position on the declaratory judgment issues, and that in some instances, matters at first deemed to be "undisputed" would resurface as contested issues requiring additional litigation. Ortiz prevailed on the declaratory judgment issues before the trial court.

We conclude that the jury could properly find that the fees it awarded were neither unreasonable nor unnecessary. We further conclude that the trial court did not abuse its discretion or err as a matter of law in finding that the fee award reflected in the jury award, and subsequent-ly incorporated in the final judgment was neither inequitable nor unjust. We overrule Montemayor's issue fourteen on appeal.

## C. Availability of Attorney Fee Award

■■ In the fifteenth issue, Montemayor urges that Ortiz had no right to recover attorney fees under the Declaratory Judgments Act because she presented no new factual or legal issues not already raised in appellants' pleadings. It is undisputed that Montemayor initiated proceedings with a suit for declaratory judgment and that Ortiz counterclaimed with her own requests for declaratory judgment. Two summary judgment orders issued declaring rights in favor of Ortiz.

Attorney fees may be recovered in actions arising under the Declaratory Judgments Act. *See* TEX. CIV. PRAC & REM.CODE ANN. § 37.009 (Vernon 1997). Montemayor contends that Ortiz's counterclaims presented no new controversies, and therefore an award of fees based thereon was improper.

■■■ When a party brings a declaratory judgment action by way of a counterclaim, and that counterclaim involves only issues already raised by the original claim, the party is not entitled to an award of attorney's fees. *Flagship Hotel, Ltd. v. City of Galveston,* 117 S.W.3d 552, 566 (Tex.App.-Texarkana 2003, pet. denied). However, this general rule only applies when a defendant files a declaratory-judgment counterclaim that presents no new issues except to recover attorneys' fees. *Hansson v. Time Warner Entm't Advance/Newhouse P'ship,* No. 03-01-00578-CV, 2002 WL 437297, at *3, 2002 Tex.App. LEXIS 2058, at *10 (Tex.App.-Austin 2002, pet. denied) (designated as opinion) (citing *Falls County v. Perkins & Cullum,* 798 S.W.2d 868, 871 (Tex.App.-Fort Worth 1990, no writ)). The rule does not apply where a defendant is defending against a

plaintiff's declaratory judgment action. *Id.*

In the present case, the plaintiff (appellant), not the defendants (appellees), invoked the Declaratory Judgments Act in its pleadings. Only after appellant instigated the declaratory judgments action as the basis for its suit did appellees then request attorney's fees under the same Declaratory Judgments Act. The request was logical and clearly authorized in defense of the main suit.

*Falls County,* 798 S.W.2d at 871.[4] Such is the case here, where Montemayor brought the initial suit as a declaratory judgment action.[5]

We conclude the trial court did not abuse its discretion in finding that Ortiz was entitled to seek and recover an award of attorney fees under the Declaratory Judgments Act. *See Bocquet,* 972 S.W.2d at 20. Accordingly, we overrule the fifteenth issue on appeal.[6]

---

**CONCLUSION**

We deny the motions for rehearing filed by appellants and by appellee.

---

**4.** Montemayor relies upon *Howell v. Mauzy,* 899 S.W.2d 690, 706–07 (Tex.App.-Austin 1994, writ denied) and *Redwine v. AAA Life Ins. Co.,* 852 S.W.2d 10, 17 (Tex.App.-Dallas 1993, no writ). However, these cases are distinguishable from *Hansson v. Time Warner Entm't Advance/Newhouse P'ship,* No. 03–01–00578–CV, 2002 WL 437297, 2002 Tex.App. LEXIS 2058 (Tex.App.-Austin 2002) (designated as opinion), from *Falls County v. Perkins & Cullum,* 798 S.W.2d 868, 871 (Tex.App.-Fort Worth 1990, no writ), and from the matter before us. In *Howell* and *Redwine,* no claim supporting an award of attorney fees existed prior to the filing of the counterclaim for declaratory judgment; these courts therefore concluded that the Declaratory Judgments Act could not be used to bootstrap a claim for attorney fees where it raised no new issues.

**5.** We further note that an award of fees under the Declaratory Judgments Act is not dependent upon whether or not the party ultimately prevails. *Bocquet v. Herring,* 972 S.W.2d 19, 20 (Tex.1998) (stating the declaratory judgments act "does not require an award of attorney fees to the prevailing party"); *Barshop v. Medina Cty. Underground Water Conserv. Dist.,* 925 S.W.2d 618, 637 (Tex.1996); *Scottsdale Ins. Co. v. Travis,* 68 S.W.3d 72, 77 (Tex.App.-Dallas 2001, pet. denied).

**6.** We note Montemayor's contention that we failed to address the third issue on appeal, that the trial court erred in determining that the 1990 judgment was not a "joint debt." The 1990 judgment, based on promissory notes, did not name Ortiz as a party or as an obligor. The record is further devoid of any evidence that Ortiz participated in any of the underlying events or even had knowledge of the 1990 judgment. In our earlier opinion, we discussed at length that the judgment was for a claim in contract and not in tort; only a tort debt can reach community property under the separate management and control of the other spouse. TEX. FAM.CODE ANN. § 3.202 (Vernon 1998). Nothing supports any contention that this earlier judgment debt was a "joint obligation" simply because Ortiz was married to a named debtor. We have already distinguished *Cockerham, v. Cockerham,* 527 S.W.2d 162 (Tex.1975), and overruled Montemayor's third issue. We reiterate that conclusion here.