COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-273-CV

 

 

ROBERT FRENCH, INDIVIDUALLY                                           APPELLANT

AND ON BEHALF OF THE ESTATE                                     AND APPELLEE

OF VELMA RAE FRENCH, DECEASED 

 

                                                   V.

 

LAW OFFICES OF WINDLE                                                       APPELLEE

TURLEY, P.C.                                                              AND
APPELLANT

 

                                              ------------

 

           FROM
THE 141ST DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








This appeal arises
out of the now ten-year pursuit of attorney=s fees by the Law
Offices of Windle Turley, P.C. (ALOWT@) against Robert
French.  A jury awarded no damages on the
quantum meruit claim filed by LOWT against French and $1,400,000 in damages on
French=s claim against
LOWT for intentional infliction of emotional distress (AIIED@).  After the trial court set aside the jury=s award on French=s claim, both
parties appealed.  Because we hold that
the evidence was legally insufficient to support the jury=s finding of no
damages for LOWT, we reverse and remand in part.  Because we hold that the trial court did not
err by setting aside the jury=s award on French=s IIED claim, we
affirm in part.

I. Facts and Procedural History

In 1995, Robert
French decided to pursue a medical malpractice claim individually and on behalf
of his wife=s estate and, to that end, on December 12,
1995, he entered into a contingent fee agreement with LOWT.  LOWT assigned firm attorney David Surratt to
work on the case.  Surratt left the firm
in late August 1997.  Before he left, on
August 11, 1997, Surratt drafted a brief internal file memorandum; the tone of
the memo was one of a less-than-positive view of the likelihood of success in
the case.  Surratt stated that he had met
with LOWT attorney Mike Sawicki to discuss French=s case and that he
briefed Sawicki on the insurer=s response to the
firm=s settlement
package and French=s strong desire to proceed with the
suit.  He noted that a Asuit might result
in some form of settlement, but we may have a lot of obstacles.@








Two days later
(and a year and eight months after LOWT took French=s case), on August 13,
1997, Surratt sent a letter to French stating that A[b]ased
on our analysis and considering the insurer=s recent
denial of a possible pre-suit settlement, we have determined that our firm
would not be in a position to represent you in pursuit of a lawsuit.@  Surratt recommended that French consult
another attorney about his options before deciding what to do about his
case.  Surratt stated that the firm had
closed French=s file and that Surratt would Aprepare
a packet of materials which would be helpful to an attorney=s
evaluation of your case.@ 
The letter informed French that his cause of action had a two-year
statute of limitations.

French asked LOWT
to reconsider, and consequently, LOWT agreed to have Sawicki review the
case.  Sawicki filed suit on behalf of
French on September 5, 1997.  Sawicki
worked on the case for LOWT until February 2000, at which point he also left
the firm.

After Sawicki
left, French became unhappy with his legal representation, and he eventually
terminated his relationship with LOWT and hired Sawicki.  LOWT then filed a petition in intervention in
French=s lawsuit, seeking
the full fee under the contingent fee agreement.








Sawicki, on French=s behalf, filed a
motion to strike the intervention and subsequently asked LOWT to submit the
dispute to the Texas Bar Association Fee Dispute Committee.[2]  Sawicki noted in a letter to LOWT that the
disciplinary rules of conduct for attorneys encourage attorneys to settle fee
disputes with clients through alternative dispute resolution.[3]  Sawicki, on behalf of French, also offered to
reimburse LOWT for its expenses incurred while working on the case and to share
attorney=s fees.[4]  When LOWT declined to work out any kind of
fee-sharing arrangement, French then asked LOWT to take the case back, but it
refused.  When Sawicki filed a motion to
withdraw as counsel and substitute LOWT, LOWT filed a response refusing to be
substituted as counsel.  It asserted that
an attorney-client relationship between the parties would not be possible given
their history.  The trial court
subsequently granted French=s motion to strike
LOWT=s intervention.[5]








French proceeded
to trial in Tarrant County with Sawicki as counsel.  After French obtained a favorable jury
verdict, LOWT refiled its petition in intervention, asserting claims for breach
of contract and quantum meruit.[6]

LOWT also filed a
lawsuit in Dallas County, seeking attorney=s fees and Ainjunctive relief
prohibiting the District Clerk of Tarrant County from releasing any funds paid
into the Registry of the Court that represented disputed attorney=s fees and
expenses.@[7]  The trial court there dismissed the suit on
French=s motion, finding
that LOWT=s pleadings were frivolous and groundless
and were brought for the purposes of harassment, needlessly prolonging
litigation and creating unnecessary expense. 
The court awarded French sanctions in the amount of $4,876.25.  That ruling was upheld on appeal by the
Dallas Court of Appeals.[8]








In the Tarrant
County lawsuit, both parties moved for summary judgment on LOWT=s second petition
in intervention.[9]  French argued that LOWT had abandoned its
contingent fee agreement with him, LOWT=s attempt to
recover the fee was unconscionable, the contingent fee agreement violated
public policy, and he had good cause to terminate the contract with LOWT.[10]  The trial court granted French=s motion and
denied LOWT=s.[11]  On appeal, this court reversed and remanded
the contingency fee dispute to the trial court.[12]

After remand, a
jury trial was held on LOWT=s quantum meruit
claim (LOWT had dropped its breach of contract claim against French on the day
of trial) and an IIED claim filed by French. 
The trial court denied LOWT=s motion to
disqualify Sawicki from representing French, in which it had asserted that
Sawicki should be disqualified because he was a necessary witness as to
essential facts on LOWT=s quantum meruit claim.  After hearing testimony, the jury entered a
verdict finding LOWT=s damages to be $0.  The jury also found for French on his IIED
claim, awarding him $1,400,000.  The
trial court, on LOWT=s motion, set aside that finding and
rendered a judgment notwithstanding the verdict (AJNOV@) against French
on his IIED claim.

 

 








II.  LOWT=s Cross-Appeal

LOWT=s Quantum Meruit
Claim

We address LOWT=s cross-appeal
first.  LOWT brings two issues on
appeal.  In its first issue, it argues
that the evidence was legally and factually insufficient to support the jury=s finding of $0 on
its quantum meruit claim.

Standard of Review

We may
sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.[13]
 A party complaining that the evidence is
factually insufficient on a finding on which the party had the burden of proof
must show that the jury=s finding was Aagainst the great
weight and preponderance of the evidence.@[14]

 








Applicable Law

Quantum meruit is
an equitable remedy, independent of a contract,[15]
Abased upon the
promise implied by law to pay for beneficial services rendered and knowingly
accepted.@[16]  Recovery under this remedy is available to a
party when the nonpayment for the services rendered would A>result in an
unjust enrichment to the party benefitted by the work.=@[17]  To recover under quantum meruit, the party
must show that valuable services were rendered for the defendant and that the
services were accepted, used, and enjoyed by the defendant, under such
circumstances as reasonably notified the defendant that the plaintiff in
performing such services was expecting to be paid by the defendant.[18]








When an attorney
working on a contingent-fee basis is discharged without cause before the
representation is completed, the attorney may seek compensation in quantum
meruit, subject to the prohibition against charging or collecting an
unconscionable fee.[19]
 If an attorney abandons his
client without just cause, the attorney forfeits his right to compensation.[20]
 In such a case, the law does not
provide that services rendered have no value; rather, when payment is excused
because of the attorney=s abandonment, the attorney may
not recover for the services, regardless of their value.[21]

In determining
whether a fee is reasonable, the factfinder should consider the following
factors, as applicable:

(1)
the time and labor required, the novelty and difficulty of the questions
involved, and the skill required to perform the legal service properly;

 

(2)
the likelihood . . . that the acceptance of the particular employment will
preclude other employment by the lawyer;

 

(3)
the fee customarily charged in the locality for similar legal services;

 

(4)
the amount involved and the results obtained;

 

(5)
the time limitations imposed by the client or by the circumstances;

 








(6)
the nature and length of the professional relationship with the client;

 

(7)
the experience, reputation, and ability of the lawyer or lawyers performing the
services; and

 

(8) whether the fee is fixed or contingent
on results obtained or uncertainty of collection before the legal services have
been rendered.[22]

Testimony at Trial








LOWT
called Sawicki as its first witness. 
Sawicki testified that he did not know how much the services he provided
at LOWT were worth.  When asked if he had
taken any depositions while at the firm, he stated that he thought he had but
could not remember.  He disagreed with an
assessment that the case was 80% ready for trial when he left the firm.  When asked if he thought it was 50% ready, he
stated that A[t]he short answer would be, no,@ and AI don=t know
how to quantify percentages, so I can=t say
that.@  He asserted his belief that LOWT was not
entitled to recover for work done by Surratt and that there should be no
compensation for it because Surratt had done nothing to create value for the
case, but he agreed that LOWT was entitled to recover the value of services
that he himself had rendered while at LOWT. 
He assumed that he had filed a request for admissions from the defendant,
but he could not remember specifically having done so, and he could not say how
long it would have taken him to do so because he sometimes used forms for
drafting such documents.  He further
stated that it may have been something that a legal assistant at the firm had
done.  He agreed that if he had used a
form, he probably would have read over it and made sure it was tailored to
French=s
case.  He did not specifically remember
sending a request for admissions to one of the defendants in the medical
malpractice case, although he assumed that he had done so.  When asked if LOWT should be compensated for
his filing a request for admissions, Sawicki stated, AI guess
so.@

He
agreed that he had sent some interrogatories to the defendants, but he did not
remember if he wrote them himself or used a form.  He did not specifically remember sending any,
but he stated that it was likely that he did so.  He also stated that it was likely he had sent
some requests for production, although he did not remember.  When asked if such work provided Agood and
valuable services,@ he testified AI guess
so,@ but he
was not sure what was meant by Agood and
valuable.@








All in
all, Sawicki=s testimony was that he did not
remember drafting documents such as requests for admission or interrogatories,
but in all likelihood he did do so because that is what he normally would have
done.  He could not remember how long
such tasks would have taken because he could have used a form, and if he used a
form, it would not have taken much time.

Sawicki
filed the original petition in French=s
lawsuit, and it was nine pages long.  He
agreed that if the defendant=s
attorney had sent something to LOWT, he would have read it.  When asked if this service would have been
valuable to French, he stated, AI guess
so@ and
then Ayes.@  He was asked what percentage of work on the
case had been done prior to April 20, 2000, when French informed LOWT that he
no longer wanted the firm to represent him, and he stated that he could not
give a percentage.

In terms
of value, Sawicki stated that his evaluation of the value of the case as of the
day that French brought him the case would have been based on the settlement
offer on the table at that time, which was in the range of $125,000 to
$150,000.  Thus, he testified, 40% of
that figure was what LOWT Acould
have picked up off the table@ on that
date.  He did not state that figure as
what he thought his services at LOWT were worth but rather as what LOWT could
have recovered in attorney=s fees
from French as of that date. 








On
cross-examination, Sawicki testified that on August 13, 1997, Surratt had sent
a letter to French stating that the firm could not proceed further with the
claim, and as of that date, LOWT had not filed suit on French=s
behalf.  By this time, it was close to
the two-year statute of limitations on French=s
claim.  After Sawicki left the firm, John
Kirtley was assigned to the case. 
Kirtley told French that he had never tried a medical malpractice case
and was looking forward to learning about them. 
Sawicki also testified that Turley=s assistant
at LOWT told French that he should get another lawyer.  Sawicki tried to work out a joint venture
arrangement with LOWT, but Turley refused. 
Sawicki tried to send the files back to LOWT, but the firm refused
delivery of the files and declined to represent French any further.

LOWT
next called Steve Maxwell as an expert witness. 
Maxwell testified that he was board certified in personal injury
law.  LOWT provided him with 4,000 or
5,000 pages of documents, which were copies of work done on the French case
from the time French hired LOWT through April 24, 2000.  Maxwell did not look at all the documents
that were sent to him, but he did go through the boxes and formed a general
idea of what the documents comprised.








Maxwell
testified that from his review, most of the work had been done by Sawicki and
that Sawicki had done an excellent job. 
In his opinion, there was value to a client in the process an attorney
goes through in evaluating whether to go forward with a case.  He testified that it looked like Surratt had
been investigating the case prior to Sawicki taking over.  Maxwell testified that Surratt had done
everything he was supposed to do. 
Maxwell also stated that prior to April 2000, when French notified LOWT
that he no longer wished the firm to represent him and that he was hiring
Sawicki, depositions were taken, interrogatories and requests for disclosure
were sent out, and motions to compel were filed.

LOWT=s
attorney asked Maxwell his opinion as to the minimum amount of hours he thought
would have been necessary to perform the work that he had reviewed.  Maxwell stated that, based on his experience,
anywhere from 400 to 700 hours Awould
not be at all unusual@ as an accurate recounting of
the time that was spent on the work.  No
evidence of billing records was introduced, and there was no testimony from
anyone at LOWT about the amount of time actually spent on the case.  Maxwell testified that when time records are
not kept, it is impossible to be precise as to how much time is spent on a
case, but that he could go through the documents produced and Aget a
pretty good idea of all of the work that was being done@ and
that Ait=s
obvious that hundreds of hours were spent.@  Maxwell further stated that his guess was
that for a medical malpractice case worked on a contingency basis in 1996
through 2000, a $350 to $400 an hour billing rate would be Ain the
middle of what would be a reasonable fee on that kind of basis.@








On
cross-examination, Maxwell acknowledged that he did not review what went on in
the trial.  When asked if he would agree
then that he did not know what actually won or lost the case, he stated, AI have
my beliefs, because I can look at what was done to get this case ready, and I
can kind of see where the strengths and the weaknesses [lie],@ but he
acknowledged that he did not know what document, deposition, testimony,
arguments, or facts won the underlying case.

Analysis








In a
pretrial conference held the day of the trial, Sawicki expressed concern to the
trial court about whether he would be allowed to present evidence on whether
the attorney-client relationship had been terminated for good cause.  The trial court responded that it believed
that because LOWT had dropped its breach of contract claim, it had negated the
issue of good cause.  The trial court did
indicate that it would allow some testimony about events prior to the date of
termination.  In his proposed jury
charge, French submitted a question asking whether he had good cause to
terminate his contract with LOWT.  In the
charge submitted to the jury, though, the jury was not asked whether French had
terminated the contract with LOWT for good cause or if LOWT had abandoned
French without just cause.[23]  French also submitted a question asking
whether French=s compliance with the contract
was waived, but the trial court denied French=s
request to include that question.

Page
three of the charge included a section headed AINSTRUCTIONS,@ under
which only the following appeared:

Failure to comply by [French] is excused if all the following
circumstances occurred:

 

1.     [LOWT]

 

a.      by words or conduct made a false representation or concealed a
material fact,

 

b.     with knowledge of the facts or with knowledge or information
that would lead a reasonable person to discover the facts, and

 

c.      with the intention that [French] would rely on the false
representation or concealment in acting or deciding not to act, and

 

2.     [French]

 

a.      did not know and had no means of knowing the real facts, and

 

b.     relied to his detriment on the false representation or
concealment of the material facts.

 

The jury was not, however, asked
to make a finding about whether French was excused.  French does not argue on appeal that the
trial court erred by omitting a question on excuse. 








Question
one appears on the next page of the charge. 
That question asked,

What is the reasonable value of work performed by [LOWT] on Robert
French=s behalf from December
12, 1995 to April 20, 2000?

 

Factors to consider in determining the reasonable value, if any, areC

 

(1)     the
time and labor required, the novelty and difficulty of the questions involved,
and the skill required to perform the legal service properly;

 

(2)     the
likelihood . . . that the acceptance of the particular employment will preclude
other employment by the lawyer;

 

(3)     the
fee customarily charged in the locality for similar legal services;

 

(4)     the
amount involved and the results obtained;

 

(5)     the
time limitations imposed by the client or by the circumstances;

 

(6)     the
nature and length of the professional relationship with the client;

 

(7)     the
experience, reputation, and ability of the lawyer or lawyers performing the
services; and

 

(8)     whether
the fee is fixed or contingent on results obtained or uncertainty of collection
before the legal services have been rendered.

 

Answer in dollars and cents, if any.

 








The
charge did not include any instruction on quantum meruit, and the jury was not asked
to make any findings on the separate elements of quantum meruit.  In other words, the charge=s
question assumed that LOWT proved its entitlement to recover on its quantum
meruit claim.  Although French objected in
the trial court that there was no evidence to support the claim=s
elements, and thus no question on quantum meruit should be submitted to the
jury, he did not object to the failure to include questions on the specific
elements of the actual claim.  We
therefore measure the sufficiency of the evidence against the charge that was
actually submitted, rather than the charge that should have been submitted.[24]








Because
of the way that the charge was written, we cannot determine the basis for the
jury=s
decision.  That is, we cannot determine,
for example, whether the jury=s answer
contains an implied finding that payment is excused or whether it was a finding
that no valuable services were rendered after considering the Arthur
Anderson factors.  Whatever the jury=s
reasoning, we are guided by the holding of the Supreme Court of Texas in Midland
Western Building.[25]  In that case, the jury had awarded damages
for the plaintiff but did not award attorney=s
fees.  The court said:

The jury=s award
of no fees, however, was improper.  First
Service offered evidence of its attorney=s fees
and the value thereof.  While the jury
could have rationally concluded that a reasonable and necessary fee was less
than the amount sought, an award of no fees was improper in the absence of
evidence affirmatively showing that no attorney=s
services were needed or that any services provided were of no value.[26]

And this court has held that the
evidence is insufficient to support a jury=s
finding of no value of work in a quantum meruit claim when the evidence is
uncontroverted that a person=s work
had value, even if there is no conclusive evidence of a specific value of the
work.[27]









Similarly,
in this case, French did not make an affirmative showing that no attorney=s
services were needed or that the services provided were of no
value.  French=s and
Sawicki=s
testimony contradicted LOWT=s
evidence as to value but did not establish a lack of any value.  Although Sawicki could not give an accurate
estimate of the time that he spent on the case while at LOWT, and he did not
establish a definite value for the services, he did not affirmatively show that
the services were of no value whatsoever. 
And even Sawicki acknowledged, albeit reluctantly, that at least some of
the services that he assumed he had provided had some value to French. So even
if the jury disbelieved Maxwell=s
testimony in estimating the value of the services provided, which would have
left the jury with no testimony as to what the value actually was, there was no
showing at the trial that the proper measure of the value was zero.  Thus, although the jury could have perhaps
properly found that the services were worth less than Maxwell asserted, it
could not find $0.  Accordingly, because
there was no evidence to support the jury=s
finding and LOWT established that its services were of some value, we sustain
Appellant=s first issue.  Because under the evidence, LOWT
established that its services were of some value but did not establish a
specific value of the services as a matter of law, under Midland, we
remand this question to the trial court.[28]


 








Sawicki=s Representation
of French

In its second
issue, LOWT argues that the trial court abused its discretion by refusing to
disqualify Sawicki and allowing him to act as French=s attorney and
testify as a witness.  It contends that
Sawicki was an essential witness in the litigation and that the trial court=s permitting him
to testify was prejudicial to LOWT.

Standard of Review

We review a trial
court=s denial of a
motion to disqualify counsel under an abuse of discretion standard.[29]  A trial court abuses its discretion if it
acts arbitrarily and unreasonably or without reference to any guiding
principles.[30]  A trial court also abuses its discretion if
it fails to analyze or apply the law correctly.[31]

Analysis








Rule
3.08 of the Texas Rules of Disciplinary Procedure provides that an attorney
shall not act as an advocate in an adjudicatory proceeding if the attorney
knows or believes that he Amay be a
witness necessary to establish an essential fact@ on his
client=s behalf
unless

(1) the testimony relates to an uncontested issue;

 

(2) the testimony will relate solely to a matter of formality and
there is no reason to believe that substantial evidence will be offered in
opposition to the testimony;

 

(3) the testimony relates to the nature and value of legal services
rendered in the case;

 

(4) the lawyer is a party to the action and is appearing pro se; or

 

(5) the lawyer has promptly notified opposing counsel that the lawyer
expects to testify in the matter and disqualification of the lawyer would work
substantial hardship on the client.[32]


 

Comment nine to this rule states
that the rule is a disciplinary standard Aand is
not well suited to use as a standard for procedural disqualification.@[33]  Although the rule does not provide a standard
for disqualification proceedings, comment ten states that the rule may provide guidance
in a disqualification dispute.  The
Supreme Court of Texas has recognized that the rule provides guidelines
relevant to a disqualification determination.[34]  








Comment
ten states that the rule Ashould not be used as a tactical
weapon to deprive the opposing party of the right to be represented by the
lawyer of his or her choice.@[35]  For example, Aa lawyer
should not seek to disqualify an opposing lawyer by unnecessarily calling that
lawyer as a witness.@[36]  And the supreme court has stated that
disqualification is a severe remedy that Acan
cause immediate harm by depriving a party of its chosen counsel and disrupting
court proceedings.@[37]  Accordingly, disqualification is only
appropriate if Athe lawyer=s
testimony is >necessary to establish an
essential fact=@ and if
the party requesting disqualification demonstrates Athat the
opposing lawyer=s dual roles as attorney and
witness will cause the party actual prejudice.@[38]








In Sanders,
a husband in a divorce proceeding arranged with his attorney to pay part of his
legal fees by remodeling her offices.[39]  The wife sought to disqualify the husband=s
attorney on the ground that as an employer of a party in a custody case, the
attorney would be a material witness to establish whether his employment
schedule would interfere with his parenting duties and his ability to pay child
support.[40]  The supreme court stated that, assuming such
fact was Aessential,@ the
wife failed to explain why other sources in the record were insufficient to
establish it, and accordingly, the trial court did not abuse its discretion by
declining to disqualify the attorney on that ground.[41]


Here, as
the party seeking disqualification, LOWT had the burden to show that Sawicki=s
testimony was necessary to establish a necessary fact and that Sawicki=s dual
roles as attorney and witness would cause it actual prejudice.[42]  LOWT had to establish the reasonable value of
the services that it provided to French. 
LOWT argued to the trial court that it had to call Sawicki as a witness
because Sawicki=s testimony A[went]
to the very heart of what=s at stake here,@ that
Sawicki A[had]
personal knowledge of what he did in this case, when he did it in the case,
[and] how much effort he put into it,@ and
that LOWT did not have any other witnesses who could testify about that.








But LOWT
had other evidence to establish the reasonable value of its services to
French.  LOWT had boxes of documents
produced by the LOWT lawyers and staff employees who worked on French=s case,
including Sawicki.  LOWT had an expert
witness to testify about the kinds of hours required for a medical malpractice
case like French=s, the work that Sawicki did at
the firm, the quality of his work, the amount of time such work would have
required, and the reasonable rates for such work.  LOWT also had other attorneys and employees
that it could have called to testify about work performed on French=s behalf
before Sawicki worked on the case, while Sawicki worked on the case, and after
he left the firm.  Thus, LOWT failed to
show that calling Sawicki as a witness was necessary to establish the
reasonable value of its services. 
Consequently, the trial court did not abuse its discretion by denying
LOWT=s motion
to disqualify Sawicki from representing French. 
We overrule LOWT=s second issue.

III.  French=s Cross Appeal

In French=s sole issue on
cross-appeal, he argues that the trial court erred by entering a judgment not
withstanding the jury verdict on his IIED claim because there is legally
sufficient evidence to support the award.

Standard of Review








A trial
court may disregard a jury verdict and render a JNOV if no evidence supports
the jury finding on an issue necessary to liability or if a directed verdict
would have been proper.[43]  A directed verdict is proper only under
limited circumstances: (1) when the evidence conclusively establishes the right
of the movant to judgment or negates the right of the opponent; or (2) when the
evidence is insufficient to raise a material fact issue.[44]

To
determine whether the trial court erred by rendering a JNOV, we view the
evidence in the light most favorable to the verdict under the well-settled
standards that govern legal sufficiency review.[45]  We must credit evidence favoring the jury
verdict if reasonable jurors could and disregard contrary evidence unless
reasonable jurors could not.[46]

Analysis








A plaintiff
asserting a claim for IIED must prove that A(1) the defendant
acted intentionally or recklessly; (2) the conduct was extreme and outrageous;
(3) the actions of the defendant caused the plaintiff emotional distress; and
(4) the resulting emotional distress was severe.@[47] No claim for IIED
can be maintained Awhen the risk that emotional distress will
result is merely incidental to the commission of some other tort,@ and, A[a]ccordingly, a
claim for [IIED] will not lie if emotional distress is not the intended or
primary consequence of the defendant=s conduct.@[48] 








Conduct is extreme
and outrageous if it is A>so outrageous in
character, and so extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly intolerable in a
civilized community.=@[49]  A court determining whether certain conduct
is extreme and outrageous should consider the context and the relationship
between the parties.[50]  A>The extreme and
outrageous character of the conduct may arise from an abuse by the actor of a
position, or a relation with the other, which gives him actual or apparent
authority over the other, or power to affect his interests.=@[51]  If a person does no more than
insist on his legal rights in a permissible way, he cannot be liable for
causing emotional distress in doing so.[52]

An
attorney in Texas is permitted to seek recovery of a fee, either in
contract  or in quantum meruit, depending
on how the relationship between the attorney and the client ended.[53]  Thus, LOWT had a legal right to seek recovery
of at least the reasonable value of its services, subject to a defense that
LOWT had abandoned its representation of French without just cause.  Even knowledge that, in doing so, it would
cause French emotional distress does not make LOWT liable on an IIED claim.[54]













Of
course, the manner in which a party pursues its legal rights may sometimes be
actionable,[55]
but the supreme court has set a high bar for 
plaintiffs pursuing such a claim in the context of a dispute in a
business relationship.  In Tiller v.
McLure, the supreme court addressed an IIED claim that arose out of a
dispute over two commercial contracts.[56]  McLure and her husband owned a business that
contracted to do construction work for Tiller.[57]  After McLure=s
husband was diagnosed with a malignant brain tumor, she sent Tiller a letter
informing him of her husband=s
condition and designating herself as a contact person for concerns and
complaints about the project.  Tiller
made Anumerous
and unpleasant@ calls to McLure, all related to
the contracts, that were Aself-centered and often
unprofessional.@[58]  In none of his calls did Tiller directly
attack McLure; rather, his complaints and threats all related to the project.[59]  After McLure=s
husband died, Tiller learned that she intended to shut down the construction
site for the day of the funeral so that company employees could attend.[60]  Tiller objected and threatened to terminate
the contract if she did so.  Between
McLure=s taking
over the lead on the project and the end of the project, Tiller telephoned her
over sixty times.  The court noted that
Tiller=s
actions were Aregularly insensitive,
unreasonable, or otherwise wrongful@ but, in
context, did not rise to the level of extreme and outrageous.[61]









Furthermore,
in Creditwatch, the supreme court held that the act of the plaintiff=s former
employer in orchestrating a post-termination eviction of the plaintiff was Acallous,
meddlesome, mean‑spirited, officious, overbearing, and vindictiveCbut not >so
outrageous in character, and so extreme 
in degree, as to go beyond all possible bounds of decency, and to be
regarded as atrocious, and utterly intolerable in a civilized community.=@[62] The
court stated that A[w]e certainly understand
judicial reticence to dismiss claims like this one stemming from heinous acts@ but
that Asuch
acts will rarely have merit as intentional infliction claims,@ Aexcept
in circumstances bordering on serious criminal acts.@[63]  Pursuing a claim to be paid what one believes
is owed him does not rise to the level of outrageous conduct required by the
supreme court in an IIED claim.[64]









French
argues that LOWT owed him a fiduciary duty and that its conduct must therefore
be viewed with stricter scrutiny than the conduct of an individual in an
ordinary relationship.  The supreme court
has instructed us that context matters in determining whether certain conduct
is extreme and outrageous.[65]  An attorney seeking recovery of a fee can, in
theory, pursue recovery in such a way that would constitute outrageous
behavior.[66]  But here it was only LOWT=s
pretrial refusal to agree to less than the contracted-for fee and its pursuit
of its fee through judicial means that caused French=s
emotional distress.  A pursuit of a legal
right, done in a legally permissible manner, even if done with callous
disregard for the emotional distress such pursuit will cause, will not subject
an actor, even an attorney, to liability for IIED.[67]  Furthermore, the actions complained of by
French as causing his emotional distress all occurred after the attorney-client
relationship between French and LOWT had ended.[68]








LOWT did
put French in a position that the jury may have considered unconscionable: by
asserting its right to a 40% recovery, LOWT left French with potentially
oppressive alternatives of choosing, at the extreme, a much smaller share of
recovery or an attorney with much less experience who was willing to accept a
much smaller contingency fee.  After
putting French in such a position, LOWT then refused to accept the case back,
so that if French went forward with his case and won, he would be forced to pay
(if LOWT successfully recovered its share) for more than one attorney.  After intervening in the Tarrant County
lawsuit, LOWT filed a separate lawsuit in Dallas County, subjecting French to
not one but two lawsuits over the same fees, one of which was found to be
frivolous.  The jury, faced with an
attorney who would put a client in such a position, especially an older client
involved in a lawsuit over the unexpected loss of his spouse, may have felt
that the attorney=s behavior was outrageous,
atrocious, and utterly intolerable.  But
the law in this state provides that a party pursuing its legal rights in a
permissible way is not outrageous conduct per se, and we must apply that law.

French
argues that none of the acts of LOWT in pursuing payment were justified, Alet
alone reasonable.@ That may be so, but neither
were they outrageous enough in character to meet the standards for an IIED
claim as set out by the supreme court in Tiller and Creditwatch.[69]  We overrule French=s sole
issue.

IV.  Conclusion

Having
overruled French=s sole issue on appeal, we
affirm the trial court=s judgment notwithstanding the
verdict on French=s IIED claim.  Having sustained LOWT=s first
issue, we reverse the trial court=s
take-nothing judgment on LOWT=s claim
and remand for a new trial on LOWT=s
quantum meruit claim. 

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  LIVINGSTON and
DAUPHINOT, JJ.

 

DELIVERED:  March 4, 2010











[1]See Tex. R. App. P. 47.4.





[2]Law Offices of Windle
Turley, P.C. v. French, 140 S.W.3d 407, 409 (Tex. App.CFort Worth 2004, no pet.).





[3]See Tex. Disciplinary R. Prof=l Conduct 1.04 cmt. 19, reprinted
in Tex. Gov=t Code Ann., tit. 2,
subtit. G app. A (Vernon Supp. 2009) (Tex. State Bar R. art X, ' 9) (AIf a procedure has been
established for resolution of fee disputes, such as an arbitration or mediation
procedure established by a bar association, the lawyer should conscientiously
consider submitting to it.@); see also Fee Arbitration Rules, Tarrant
County Bar Association Fee Arbitration Comm. (setting out rules for voluntary
arbitration of fee disputes between attorneys practicing before courts in
Tarrant County and their clients), available at http://www.tarrantbar.org/Default.aspx?tabid=50.





[4]Windle Turley, 140 S.W.3d at 409.





[5]Id. at 410.





[6]Id.





[7]Law Offices of Windle
Turley, P.C. v. French, 164 S.W.3d 487, 489 (Tex. App.CDallas 2005, no pet.).





[8]Id. at 494.





[9]Windle Turley, 140 S.W.3d at 410.





[10]Neither Gwenda Dunn,
another plaintiff in the underlying action, nor her motion for summary
judgment, is before us.





[11]Windle Turley, 140 S.W.3d at 410.





[12]Id. at 415.





[13]Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, ANo Evidence@ and AInsufficient Evidence@ Points of Error, 38 Tex. L. Rev. 361,
362B63 (1960).





[14]Cropper v. Caterpillar
Tractor Co.,
754 S.W.2d 646, 651 (Tex. 1988); see Herbert v. Herbert, 754 S.W.2d 141,
144 (Tex. 1988).





[15]Residential Dynamics, LLC
v. Loveless,
186 S.W.3d 192, 198B99 (Tex. App.CFort Worth 2006, no
pet.).





[16]Campbell v. Nw. Nat=l Life Ins. Co., 573 S.W.2d 496, 498
(Tex. 1978); Residential Dynamics, 186 S.W.3d at 199.





[17]Residential Dynamics, 186 S.W.3d at 198
(quoting City of Ingleside v. Stewart, 554 S.W.2d 939, 943 (Tex. Civ.
App.CCorpus Christi 1977, writ
ref=d n.r.e.)).





[18]Vortt Exploration Co., Inc. v.
Chevron U.S.A., Inc.,
787 S.W.2d 942, 944 (Tex. 1990).





[19]Hoover Slovacek LLP v. Walton, 206 S.W.3d 557, 561B62 (Tex. 2006).





[20]Royden v. Ardoin, 160 Tex. 338, 331
S.W.2d 206, 209 (1960).





[21]See id. (stating that
an attorney is not entitled to compensation when he abandons his client without
just cause before the proceeding for which he was retained has been conducted
to its termination).





[22]Arthur Andersen & Co.
v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997); Burnside Air Conditioning &
Heating, Inc. v. T.S. Young Corp., 113 S.W.3d 889, 897B98 (Tex. App.CDallas 2003, no pet.)
(noting that the record need not contain evidence on each of the factors).





[23]See Royden, 331 S.W.2d at 209
(stating that an attorney is not entitled to compensation when he abandons his
client without just cause before the proceeding for which he was retained has
been conducted to its termination).





[24]See Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex.)
(holding that when no objection is made to the charge, the sufficiency of the
evidence is measured against the charge submitted), cert. denied, 530
U.S. 1244 (2000); St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 530 (Tex.
2002) (holding that when the opposing party objects to the charge, sufficiency
of the evidence is measured against the charge that should have been
submitted).





[25]Midland W. Bldg. L.L.C.
v. First Serv. Air Conditioning Contractors, Inc., 300 S.W.3d 738, 739
(Tex. 2009) (per curiam).





[26]Id.





[27]Kitchen v. Frusher, 181 S.W.3d 467, 476
(Tex. App.CFort Worth 2005, no
pet.).  





[28]See Midland, 300
S.W.3d at 739B40 (reversing and
remanding on legal sufficiency grounds when there was no evidence to support
the jury=s verdict of zero
attorney=s fees but no specific
amount of attorney=s fees was established as
a matter of law); see also McMillin v. State Farm Lloyds, 180 S.W.3d
183, 210C11 (Tex. App.CAustin 2005, pet. denied)
(reversing the jury=s award of zero attorney=s fees because no
evidence supported it and remanding the issue to the trial court because the
record did not conclusively prove any particular amount as reasonable and
necessary).





[29]See In re Sanders, 153 S.W.3d 54, 56 (Tex.
2004).





[30]Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241B42 (Tex. 1985), cert. denied, 476 U.S.
1159 (1986).





[31]Sanders, 153 S.W.3d at 56.





[32]Tex. Disciplinary R. Prof=l Conduct 3.08(a), reprinted
in Tex. Gov=t Code, tit. 2, subtit. G
app. A (Vernon 2005).





[33]Id. cmt. 9.





[34]Sanders, 153 S.W.3d at 56. 





[35]Tex. Disciplinary R. Prof=l Conduct 3.08(a) cmt.
10.





[36]Id.





[37]Sanders, 153 S.W.3d at 57.





[38]Id.





[39]Id. at 56.





[40]Id.





[41]Id. at 57.





[42]See id.





[43]See
Tex. R. Civ.
P. 301; Tiller v. McLure,
121 S.W.3d 709, 713 (Tex. 2003); Fort Bend County Drainage Dist. v. Sbrusch,
818 S.W.2d 392, 394 (Tex. 1991).





[44]Prudential Ins. Co. of
Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000); Farlow v.
Harris Methodist Fort Worth Hosp., 284 S.W.3d 903, 919 (Tex. App.CFort Worth 2009, pet.
denied).  





[45]See Wal-Mart Stores, Inc.
v. Miller,
102 S.W.3d 706, 709 (Tex. 2003).





[46]Cent. Ready Mix Concrete
Co. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007); see Tanner v. Nationwide Mut. Fire Ins. Co.,
289 S.W.3d 828, 830 (Tex. 2009).





[47]GTE Sw., Inc. v. Bruce, 998 S.W.2d 605, 611
(Tex. 1999); see also Standard Fruit & Vegetable Co. v. Johnson, 985
S.W.2d 62, 65 (Tex. 1998).





[48]GTE Sw., 998 S.W.2d at 611;
see also Standard Fruit & Vegetable, 985 S.W.2d at 66.





[49]Natividad v. Alexsis,
Inc.,
875 S.W.2d 695, 699 (Tex. 1994) (quoting Twyman v. Twyman, 855 S.W.2d
619, 621 (Tex. 1993)); Restatement (Second) of Torts ' 46 cmt. d (1965). 





[50]GTE Sw., 998 S.W.2d at 612.





[51]Id. (quoting Restatement
(Second) of Torts ' 46 cmt. e).





[52]Montemayor v. Ortiz, 208 S.W.3d 627, 656B57 (Tex. App.CCorpus Christi 2006, pet.
denied).





[53]Hoover Slovacek LLP, 206 S.W.3d at 561 (A[I]f an attorney hired on
a contingent‑fee basis is discharged without cause before the
representation is completed, the attorney may seek compensation in quantum
meruit or in a suit to enforce the contract by collecting the fee from any
damages the client subsequently recovers.@); Royden, 331 S.W.2d at 209 (stating that
an attorney who abandons his client before the proceeding for which he was
retained has been completed, or who commits a material breach of the employment
contract, is not entitled to compensation for his services).





[54]See Creditwatch, Inc. v.
Jackson,
157 S.W.3d 814, 817 n.20 (Tex. 2005); Montemayor, 208 S.W.3d at 656B57 (AWe are unable to conclude
that the pursuit of a remedy through legal process, however invasive, or even
injurious, constitutes outrageous conduct beyond the bounds of decency, such as
that which must be established to recover for intentional infliction of
emotional distress.@).  But see, e.g., Tex. Disciplinary R. Prof=l Conduct 1.04 cmt. 19 (AIf a procedure has been
established for resolution of fee disputes, such as an arbitration or mediation
procedure established by a bar association, the lawyer should conscientiously
consider submitting to it.@).





[55]See, e.g., Household Credit
Servs., Inc. v. Driscol, 989 S.W.2d 72, 78, 81B82 (Tex. App.CEl Paso 1998, pet.
denied) (holding that the acts of a credit card company=s agent in attempting to
collect on an account gave rise to an IIED claim when the agent made repeated
calls to the debtor=s place of employment
after being asked to stop, once making twenty-six calls within a two-hour time
period; made four or five calls to her home a day, sometimes before 6:30 in the
morning and after 11 p.m. in the evening; used abusive language; told the
debtor that the agent had put a contract out on her life; and called in a bomb
threat to the debtor=s workplace).





[56]121 S.W.3d 709, 714 (Tex.
2003).





[57]Id. at 712.





[58]Id. at 714.





[59]Id. 





[60]Id. at 712.





[61]Id. at 715.





[62]Creditwatch, 157 S.W.3d at 817B18.





[63]Id. at 818 (emphasis added).





[64]See Montemayor, 208 S.W.3d at 656B57; Gaspard v. Beadle,
36 S.W.3d 229, 238 (Tex. App.CHouston [1st Dist.] 2001, pet. denied) (holding
that sending a bill to a former client after ending a sexual relationship with
her did not support an IIED claim; although the sending of the bill after
breaking up with her Aadd[ed] insult to injury,@ the attorney believed he
had a right to be paid for his legal work, and the court did not consider his
actions to be extreme and outrageous).





[65]City of Keller v. Wilson, 168 S.W.3d 802, 811
(Tex. 2005) (stating that, in reviewing IIED claims for legal sufficiency, a
court considers the context and the relationship between the parties); GTE
Sw., 998 S.W.2d at 612 (quoting Restatement (Second) of Torts ' 46 cmt. e (1965)).





[66]See, e.g., Household Credit
Servs., 989 S.W.2d at 81B82.





[67]See Wornick Co. v. Casas,
856 S.W.2d 732, 735 (Tex. 1993).





[68]See Hall v. Stephenson, 919 S.W.2d 454, 465
(Tex. App.CFort Worth 1996, writ
denied) (noting general rule that an attorney has no duty to a client after the
attorney-client relationship has ended).





[69]See Creditwatch, 157 S.W.3d at 817B18; Tiller, 121
S.W.3d at 715.